[Civ. No. 42946. First Dist., Div. Four. Feb. 2, 1979.]

In re the Marriage of CHRISTINE and FERNANDO S. CAMPA.
CHRISTINE CAMPA, Appellant, v.
FERNANDO S. CAMPA, Respondent;
CARPENTERS PENSION TRUST FUND FOR NORTHERN
CALIFORNIA, Respondent.

[Civ. No. 42506. First Dist., Div. Four. Feb. 2, 1979.]

In re the Marriage of JOAN CLARE and JAMES PATRICK DURKIN.
JOAN CLARE DURKIN, Respondent, v.
JAMES PATRICK DURKIN, Respondent;
CARPENTERS PENSION TRUST FUND FOR NORTHERN
CALIFORNIA, Appellant.

[Civ. No. 43538. First Dist., Div. Four. Feb. 2, 1979.]

CAROLYN J. BRYANT, Plaintiff and Respondent, v.
CARPENTERS PENSION TRUST FUND FOR NORTHERN
CALIFORNIA, Defendant and Appellant.

**COUNSEL**

Sims, Lipton & D'Anna and Mark Hanley Lipton for Appellant in No. 42946.

Johnson & Stanton, Thomas E. Stanton, Jr., Clay P. Bradley, Van Bourg, Allen, Weinberg & Roger and Victor J. Van Bourg for Defendant and Appellant in No. 43538, Appellant in No. 42506 and Respondent in No. 42946.

Schapiro & Thorn and Suzie S. Thorn for Plaintiff and Respondent in No. 43538.

Wycoff & Miller and Nicholas P. Barthel for Respondent Wife in No. 42506.

Harold W. Martin for Respondent Husband in No. 42506.

No appearance for Respondent Husband in No. 42946.

## OPINION

BRUNN, J.*—These three cases present the question whether the Employee Retirement Income Security Act of 1974, 29 United States Code section 1001 et seq. (hereafter ERISA) precludes California courts from joining pension funds in marriage dissolution proceedings and from ordering such funds to divide pension payments between the employee and his or her former spouse. We conclude that ERISA has no such effect for the reasons we discuss below.

As a preliminary question we also decide that a spouse may join the pension plan here involved without first submitting a claim to the plan.

I

A. In 1975 Christine Campa (hereafter Christine) petitioned for dissolution of her 21-year marriage. She and her husband entered into a written property settlement agreement. As part of the division of the community property the agreement provided that Christine would receive a specified portion of her husband's monthly retirement benefits from the Carpenters Pension Trust Fund for Northern California (hereafter Fund). Christine also waived spousal support. The Fund was not a party at this stage.

*Assigned by the Chairperson of the Judicial Council.

Christine obtained an interlocutory judgment of dissolution which incorporated the agreement and, shortly thereafter, a final judgment. The Fund at first assured Christine that it would pay her her portion of her ex-husband's benefits. The Fund changed its mind and notified Christine that it would make all pension payments directly to her husband. As a result Christine successfully moved for an order setting aside the portion of the judgment relating to retirement pay and ordering the Fund to be joined as a party.

The Fund removed the action to the United States District Court (N.D.Cal.) on the basis of its preemption claim. The district court remanded. It concluded that the action was "a simple domestic relations matter founded solely upon state law" and that the mere existence of a disputed issue of federal law did not give the court jurisdiction.

After remand the Fund answered. As defenses it pled lack of jurisdiction, failure of the joinder petition to state facts sufficient to constitute a cause of action and ERISA's preemption of "any and all State laws insofar as they may now or hereafter relate to" the Fund. Cross-motions for summary judgment ultimately followed. In its motion the Fund for the first time contended that Christine had not complied with provisions of the Trust Agreement and Pension Plan (hereafter Trust Agreement) which require that any claim for benefits be submitted to the trustees of the Fund.

The trial court denied Christine's summary judgment motion, and entered a judgment dismissing the Fund. Christine appeals. We reverse.

B. Joan Durkin (hereafter Joan) petitioned for dissolution of her 10-year marriage in 1976. On her motion early in the proceedings the Fund was joined as a party. The Fund's answer avers that the court lacks subject matter jurisdiction, that Joan had not complied with the provisions of the Trust Agreement purporting to require her to file a claim with the trustee and that ERISA preempts applicable California law.

The Fund unsuccessfully sought a summary judgment. Ultimately the trial court entered an interlocutory judgment of dissolution. The judgment included a provision ordering the Fund to pay Joan a specified portion of her husband's pension when he received pension payments.

The Fund appeals from the interlocutory judgment. (Code Civ. Proc., § 904.1, subd. (j).) We affirm.

C. The third case comes to us not directly from a marriage dissolution proceeding but from a declaratory relief action that followed in its wake. Carolyn Bryant (hereafter Carolyn) brought that action against her former husband, William, and against the Fund. Carolyn alleged that she had been divorced from William in 1973 and that she and William owned a community property asset which the dissolution judgment had failed to divide, namely William's pension "in said" Fund. She sought a declaration that she owned a half-interest in the pension and an order requiring the Fund to show her ownership on its records.

Following abortive efforts by William and the Fund to remove the action to the United States District Court and to obtain a summary judgment in the state court, the case went to trial. The Fund's defenses were the same as in *Durkin.* The court found in favor of Carolyn, fixed her interest in accordance with a formula based on the pension credits acquired during the marriage and ordered the Fund to pay directly to Carolyn her share of the pension when William starts to receive it.

The Fund appeals from the judgment. We affirm.[1]

## II

The contention that the wives in the three cases first had to present their claims to the trustees of the Fund need not detain us long.

A. The issue may not properly be before us in *Campa.* The Fund first raised it in connection with the cross-motions for summary judgment, almost a year after the Fund had been made a party. The Fund did not plead it as a defense in its answer. Under those circumstances the defense may well have been waived. (Compare *Gunderson* v. *Superior Court* (1975) 46 Cal.App.3d 138, 143-145 [120 Cal.Rptr. 35].) However, since the issue is clearly present in the other two cases, we shall decide it on its merits as to all three.

---

[1]William's appeal was dismissed earlier by this court pursuant to rule 10(c) of the California Rules of Court.

B. ■   There is no doubt that the Trust Agreement sets forth the procedure which the Fund contends that the wives should have used.[2] It is, of course, familiar law that normally such internal remedies must be exhausted before resort to the courts will be allowed. (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 177, p. 1041.) "Such internal remedies are designed not only to promote the settlement of grievances but also to promote more harmonious relationships, and the courts look with favor upon them." (*Holderby* v. *Internat. Union etc. Engrs.* (1955) 45 Cal.2d 843, 846 [291 P.2d 463].)

The principle requiring exhaustion of private administrative remedies has a number of exceptions. One of the better known of these covers situations where the decision of the administrative body is certain to be adverse. (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761]; 2 Witkin, *op. cit. supra,* § 177, p. 1044.)

Application to the Fund by the wives would have been the essence of futility. Christine tried it informally with the noted results. The Fund's position throughout the litigation of these cases has been that it would not and could not divide the pension checks between the covered husbands and their ex-wives. Indeed, in December 1975 the Trust Agreement was amended to explicitly limit spouses of retired employees "to a community property share of the pension actually received by a Retired Employee, after such receipt. . . ." Under this provision, which antedates all proceedings against the Fund in the cases before us, the trustees of the Fund would have no alternative but to turn down the wives' claims.

Under these circumstances, we will not require the empty ritual of first going to the trustees of the Fund. Such a step would certainly not

---

[2]Article IX, section 2 of the Trust Agreement provides: "No Employee, Retired Employee or other beneficiary or person shall have any right or claim to benefits under the Plan other than as specified in the Plan. Any and every claim to benefits from the Fund, and any claim or right asserted under the Plan or against the Fund, regardless of the basis asserted for the claim and regardless of when the act or omission upon which the claim is based occurred, shall be resolved by the Board of Trustees under and pursuant to the Plan and its decision with regard to the claim or right shall be final and binding upon all persons affected by the decision. The Board of Trustees shall establish a procedure for the presentation, consideration and determination of any such claim or right, which procedure shall comply with ERISA. No action may be brought for benefits under the Plan or to enforce any right or claim under the Plan or against the Fund until after the claim for benefits or other claim has been submitted to and determined by the Board in accordance with the procedure thus established and thereafter the only action which may be brought is one to enforce the decision of the Board or to clarify the rights of the claimant under such decision."

"promote the settlement of grievances" or "more harmonious relation-ships" (*Holderby, supra,* at p. 846) or any other purpose of the exhaustion of remedies rule.

## III

We turn to the main issue. As indicated earlier, we are required to decide whether ERISA precludes our courts from making pension plans parties to marriage dissolution proceedings and from ordering them to divide pension payments between the employee and his or her ex-spouse.[3]

■ Our inquiry is delineated by *Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 525 [51 L.Ed.2d 604, 613-614, 97 S.Ct. 1305]: "Our prior decisions have clearly laid out the path we must follow to answer this question. The first inquiry is whether Congress, pursuant to its power to regulate commerce, U. S. Const., Art. 1, § 8, has prohibited state regulation of the particular aspects of commerce involved in this case. Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, see, *e.g.,* U. S. Const., Art. I, § 10; *Patapsco Guano Co.* v. *North Carolina,* 171 U.S. 345, 358 (1898), 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice* v. *Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). This assumption provides assurance that 'the federal-state balance,' *United States* v. *Bass,* 404 U. S. 336, 349 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts. But when Congress has 'unmistakably . . . ordained,' *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U.S. 132, 142 (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. *City of Burbank* v.

---

[3]We reach the same conclusion as in *In re Marriage of Johnston* (1978) 85 Cal.App.3d 900 [149 Cal.Rptr. 798], which was published after our opinion was prepared, and *Johns* v. *Retirement Fund Trust* (1978) 85 Cal.App.3d 511 [149 Cal.Rptr. 551], which answers the question summarily.

In *Stone* v. *Stone* (N.D.Cal. 1978) 450 F.Supp. 919, the U.S. District Court also ruled against the preemption claim. Another judge of the same court reached the opposite result in an opinion not published as of the date of this writing. (*Francis* v. *United Technologies Corp.* (N.D.Cal. 1978) No. 77-1504 CFP.)

*Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633 (1973); *Rice* v. *Santa Fe Elevator Corp., supra,* at 230."

*Jones* dealt with state regulation of commerce, but the same principles apply to determine the effect of a congressional enactment on other state law. (E.g., *Malone* v. *White Motor Corp.* (1978) 435 U.S. 497 [55 L.Ed.2d 443, 98 S.Ct. 1185]; *Wissner* v. *Wissner* (1950) 338 U.S. 655 [94 L.Ed. 424, 70 S.Ct. 398].) In determining whether Congress has "unmistakably ordained" preemption in the situation before us, we will examine ERISA, including its provision that subchapters I and III of the act "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." (29 U.S.C. § 1144(a) (hereafter § 1144(a)).)[4] We will also analyze the aspects of California law which the Fund contends are superseded in order to determine if they "relate to" employee benefit plans within the meaning of section 1144(a).

## IV

ERISA is a pension reform law of major importance. Its objectives and principal provisions are not difficult to understand. The act must be viewed in light of the abuses it was designed to correct. Private pension plans grew rapidly after the end of World War II. In many cases they were inadequate, mismanaged and promised benefits that proved to be illusory.[5] A three-year congressional study of the private pension system "clearly established that too many workers, rather than being able to retire in dignity and security after a lifetime of labor rendered on the

---

[4]Section 1144 in pertinent part provides:

"(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

". . . . . . . . . . . . . . . . . .

"(c) For purposes of this section: (1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States. (2) The term "State" includes a State, any political subdivision thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

"(d) Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law."

[5]This background is set forth in the legislative history of the act. (See, e.g., House Rep. No. 93-533, 1974 U.S. Code Cong. & Admin. News, p. 4639 et seq.)

promise of a future pension, find that their earned expectations are not to be realized."[6]

To remedy this situation ERISA mandates major reforms:

—It limits the maximum length of time that an employee has to work before becoming a participant in a pension plan established by his employer.[7] (29 U.S.C. § 1052.)

—It sets minimum "vesting" standards, giving employees nonforfeitable rights to a pension upon reaching retirement age, whether or not they leave their employment before that age. (29 U.S.C. § 1053.)

—It requires "that contributions are made to pension plans at a rate sufficient to provide reasonable assurance that adequate funds will be on hand to meet all vested benefit claims." (1974 U.S. Code Cong. & Admin. News, at p. 5177; see 29 U.S.C. § 1081 et seq.)

—It provides "an insurance system which will protect employees and their beneficiaries in their vested pension rights, despite premature plan termination." (1974 U.S. Code Cong. & Admin. News, at p. 5177; see 29 U.S.C. § 1301 et seq.)

—It imposes "strict fiduciary obligations upon those who exercise management or control over the assets or administration of an employee pension or welfare fund, as well as . . . reporting and disclosure requirements." (1974 U.S. Code Cong. & Admin. News, pp. 5177-5178; 29 U.S.C. § 1101 et seq.)

—It provides for administrative and judicial remedies. (29 U.S.C. § 1131 et seq.)

—It makes tax changes, among them the creation of tax incentives for the establishment of individual retirement accounts. (1974 U.S. Code Cong. & Admin. News, at p. 5178.)

---

[6]Statement by the Honorable Harrison A. Williams, Jr., Chairman of the Senate Committee on Labor and Public Welfare, upon introducing the Conference Report on House Resolution No. 2. (1974 U.S. Code Cong. & Admin. News, at p. 5177.)

[7]For a concise summary of the principal ERISA provisions, see Williams' statement, footnote 6, *ante.* See also, Comment, *The Employee Retirement Income Security Act of 1974: Policies and Problems* (1975) 26 Syracuse L.Rev. 539.

■ Congress, in essence, aimed at assuring that pension rights are real—that new employees are not kept from participating in a plan for a long time and that expected benefits do not evaporate due to underfunding, maladministration, a company going out of business or a termination of employment after many years of work. The preemption claim and ERISA's section 1144(a) must be viewed in this setting. By section 1144(a) Congress clearly wanted to protect the standards and safeguards which it had created against state interference. (*In re Marriage of Pardee* (C.D.Cal. 1976) 408 F.Supp. 666.)

The crucial question becomes whether the state laws involved in the cases before us constitute such interference—whether, in other words, they frustrate or contravene what Congress intended to do and did.

California treats pension rights, whether or not vested, as community property to the extent that they derive from employment during marriage. (*In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561]; *In re Marriage of Fithian* (1974) 10 Cal.3d 592 [111 Cal.Rptr. 369, 517 P.2d 449]; see also Reppy, *Community and Separate Interests in Pension and Social Security Benefits after Marriage of Brown and ERISA* (1978) 25 UCLA L.Rev. 417.) It does so out of a recognition of the economic importance of pension rights and the need to treat them equitably. (*In re Marriage of Brown, supra.*)

When a marriage terminates the community property is divided equally between the spouses, either by agreement between them or, if they cannot agree, by the court. (Civ. Code, § 4800.) As far as pension rights are concerned this is often done by awarding them to the employee and compensating his or her spouse with other property of equal value. (*Phillipson* v. *Board of Administration* (1970) 3 Cal.3d 32 [89 Cal.Rptr. 61, 473 P.2d 765]; *In re Marriage of Brown, supra,* 15 Cal.3d at p. 848.) When pension rights are handled in this manner, pension plans are unaffected: When the employee-spouse retires they pay the whole pension to him. But this approach is often not feasible when the pension rights are not vested because of the difficulty in ascertaining their value. It may also be impractical because of the absence of offsetting property. Or the parties themselves may prefer to have the nonemployee spouse share in the pension once it starts being paid in order to provide a measure of security in later years. In such cases the court can "award each spouse an appropriate portion of each pension payment as it is paid." (*In re Marriage of Brown, supra,* 15 Cal.3d at p. 848.)

In order to effectuate the division of the pension check, a pension plan may be made a party to a marriage dissolution proceeding and ordered to send two monthly checks instead of one. (*In re Marriage of Sommers* (1975) 53 Cal.App.3d 509 [126 Cal.Rptr. 220].)[8] The trial courts in *Durkin* and *Bryant* followed the above procedures; in *Campa* the court below declined to do so for the reason we have mentioned.

■ Thus, California law as applicable to the cases before us is concerned with effectuating a fair division of the monthly pension check between the former spouses. This concern plainly has no bearing on the effort of Congress, embodied in ERISA, to assure genuine pension rights. To ask a pension plan to send two monthly checks instead of one does not interfere with any of the Congressional objectives. It is, in fact, consonant with the objective of assuring that the members of the family receive the pension which they anticipated. We cannot find in ERISA or its extensive legislative history an unmistakable ordaining or "clear and manifest purpose" to prevent states from achieving this simple and sensible aim in their domestic relations proceedings. (*Jones* v. *Rath Packing Co., supra,* 430 U.S. 519; *Ray* v. *Atlantic Richfield Co.* (1978) 435 U.S. 151 [55 L.Ed.2d 179, 98 S.Ct. 988, 994]; *Stone* v. *Stone, supra,* 450 F.Supp. 919.)

Our conclusion is reinforced by several factors. First, as we have indicated, control over how state courts dispose family assets in a divorce is wholly unnecessary in achieving the objectives of ERISA. ■ Secondly, "[d]omestic relations is a field peculiarly suited to state regulation and control, and peculiarly unsuited to control by federal courts." (*Buechold* v. *Ortiz* (9th Cir. 1968) 401 F.2d 371, 373.) We will not lightly infer that Congress intended the "radical disturbance" (*Stone* v. *Stone, supra,* 450 F.Supp. at p. 932) of "the federal-state balance" (*Jones* v. *Rath Packing Co., supra*) which would result from ousting state regulation of community property in the situations before us. One federal court has observed that the consequence would be "legalized chaos" in which "the federal judiciary will have been granted a roving commission to delineate family property law with little assistance from the Congress as to how to proceed." (*In re Marriage of Pardee, supra,* 408 F.Supp. at p. 669.)

Third, the California procedure accomplishes important objectives that do not conflict with Congress': The family assets are fairly divided, the divorce proceedings are conclusively resolved with respect to the pension and both spouses ultimately share in the pension. The integrity of pension

---

[8]The *Sommers* procedure is statutory. (*Id.,* at p. 513.) The statutes were subsequently amended. (Stats. 1977, ch. 860.) We discuss the effect of the amendment in part V-F of this opinion below.

funds remains unaffected. They do not pay out one cent more than their plans call for.

The Fund urges that ERISA seeks to reward employees for long service, to further the interest of employers in a stable work force, to insure financial security for retired employees and to provide security for the retired worker's surviving spouse. The argument that such objectives are contravened by California's treatment of pension benefits in marriage dissolutions has been rejected by our Supreme Court. (See *In re Marriage of Fithian, supra,* 10 Cal.3d 592 at pp. 597-604.)

V

It remains for us to address several specific contentions made by the Fund.

A. ■ The Fund points to ERISA's restrictions on assignment or alienation of pension benefits (29 U.S.C. §§ 206(d)(1), 1056(d)(1)) as evidence of Congress' concern that the pension benefits be preserved intact until an employee reaches retirement age. But dividing the benefits, once they are received, between an employee and his former spouse in no way clashes with this objective. It merely assures that the ex-wife partakes of the pension to the extent that it was earned as a result of the community effort. (See *In re Marriage of Brown, supra,* 15 Cal.3d at pp. 851-852.) Her rights are those of an owner, not a creditor. (*Phillipson v. Board of Administration, supra,* 3 Cal.3d at p. 44.)

The same argument was made and rejected in *Stone* v. *Stone, supra.* We agree with what the court said there (450 F.Supp. at p. 926): "The payment of benefits to a nonemployee spouse in satisfaction of her community property claim does not conflict with the purposes of § 206(d)(1). Members of the families of employees are included in the class which ERISA protects. The basic purpose of ERISA is to protect the literally millions of people who depend on benefits from private pension plans for financial independence after retirement. H.Rep.No. 93-533, 93d Cong., 2d Sess., 1974 U.S. Code Cong. & Admin. News, pp. 4639, 4640-4641; S.Rep.No. 93-127, 93d Cong., 2d Sess., 1974 U.S. Code Cong. & Admin. News, pp. 4838, 4839-4840. Congress was concerned not only about the workers themselves whose employment entitles them to benefits. Congress was also concerned about the families of those workers

who depend to the same degree on the actual availability of those benefits. It would be ironic indeed if a provision designed in part to ensure that an employee spouse would be able to meet his obligations to family after retirement were interpreted to permit him to evade them with impunity after divorce. Construing § 206(d)(1) to prevent a nonemployee spouse from enforcing marital property obligations against an employee benefit plan covered by ERISA would frustrate rather than further the policies of that provision."

B. The fund also places great stress on *Hewlett-Packard Co.* v. *Barnes* (N.D.Cal. 1977) 425 F.Supp. 1294, affirmed (9th Cir. 1978) 571 F.2d 502. There, the court held ERISA preempts a state statute which regulated employee health benefit plans in detail. The plans involved in *Hewlett-Packard* were concededly subject to regulation under ERISA. Thus, the case involved competing regulatory schemes. The irrelevance of *Hewlett-Packard* to the question before us is highlighted by the fact that its author also wrote *Stone* v. *Stone, supra,* which reached the same conclusion as we do on the precise issue here involved.

C. The Fund contends that Congress was aware of community property laws when it enacted ERISA and intended to supersede them. To bolster this contention the Fund points to tax sections of ERISA which indeed provide that they should be applied without regard to community property laws. (26 U.S.C. §§ 219, 402(e), 408.)[9] The argument proves too much. The fact that Congress chose to supersede community property laws *selectively* gives rise to a strong inference that Congress did not intend to preempt them *generally.*

D. ■ The Fund next maintains that section 1144 of ERISA affirms the principle that provisions of collective bargaining agreements negotiated under the aegis of the National Labor Relations Act generally supersede conflicting state law. (E.g., *Teamsters Union* v. *Oliver* (1959) 358 U.S. 283 [3 L.Ed.2d 312, 79 S.Ct. 297].) The pension plan here purports to prohibit the nonemployee spouse from obtaining any order or other process against the Fund. This provision, the Fund urges, must prevail over contrary California law.

---

[9]Section 219(c)(2) providing for income tax deductions states that the deduction "shall be applied [separately] without regard to any community property laws." Section 408, which provides for the establishment of individual retirement accounts states in subsection (g) that "This section shall be applied without regard to any community property laws." Section 402(e) relating to the taxation of lump sum distributions from retirement plans provides that certain paragraphs of that section "shall be applied without regard to community property laws." (§ 402(e)(4)(G).)

This argument is untenable in light of *Malone* v. *White Motor Co.,* *supra,* 435 U.S. 497 [98 S.Ct. 1185]. There the court held that the Minnesota Private Benefit Protection Act was not preempted by the National Labor Relations Act. The court noted that " 'We cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers and unions; obviously, much of this is left to the states.' *Motor Coach Employees* v. *Lockridge,* 403 U.S. 274, 289, 91 S.Ct. 1909, 1919, 29 L.Ed.2d 473 (1971)" (435 U.S. at p. 504, [55 L.Ed.2d at p. 450, 451, 98 S.Ct. at p. 1190].) The court went on to say (*ibid.*): "There is little doubt that under the federal statutes governing labor-management relations, an employer must bargain about wages, hours, and working conditions and that pension benefits are proper subjects of compulsory bargaining. But there is nothing in the NLRA, including those sections on which appellee relies, which expressly forecloses all state regulatory power with respect to those issues, such as pension plans, that may be the subject of collective bargaining. If the Pension Act is preempted here, the congressional intent to do so must be *implied* from the relevant provisions of the labor statutes. We have concluded, however, that such implication should not be made here. . . ." (Italics in original.)

An implication that Congress in the NLRA intended to abrogate community property and domestic relations laws which divide pensions between ex-spouses is even less warranted than the one unsuccessfully urged in *Malone.*

E. The Fund also contends that ERISA expressly requires it not to consent to being joined as a party to marriage dissolution proceedings and not to honor a state court order requiring benefit payments to divorced spouses. This contention is based on 29 United States Code section 1104(a) which provides, in the part relied on by the Fund: "(a)(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—[¶] (A) for the exclusive purpose of: [¶] (i) providing benefits to participants and their beneficiaries; and [¶] (ii) defraying reasonable expenses of administering the plan; . . . [¶] (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter."

"The criterion for determining whether state and federal laws are so inconsistent that the state law must give way is firmly established in our

decisions. Our task is 'to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations.]" (*Jones* v. *Rath Packing Co., supra,* 430 U.S. at p. 526 [51 L.Ed.2d at p. 614].)

■ Section 1104 is the basic fiduciary section of ERISA. In enacting it Congress was concerned over the course of conduct in pension fund transactions, the degree of responsibility required of fiduciaries, the types of persons who should be deemed fiduciaries and standards of accountability for them. (See, e.g., 1974 U.S. Code Cong. & Admin. News, pp. 4847, 4645, 5075 et seq.) Adherence to fiduciary standards is essential to the proper administration of a pension plan. Dividing pension benefits, once they are being paid out, between the former spouses, has no bearing on the honest and skillful administration of a pension plan.

*Wissner* v. *Wissner, supra,* 338 U.S. 655, relied on by the Fund, does not aid its position. *Wissner* dealt with a section of the National Service Life Insurance Act of 1940 which gave the insured under a serviceman's policy the right to designate the beneficiary. The court held that California could not frustrate this right by ordering half the proceeds of the policy to be paid to the serviceman's widow. Thus, *Wissner* involved a head-on clash between a specific enactment of Congress and state law. As the *Wissner* court noted, "the judgment below nullifies the soldier's choice and frustrates the deliberate purpose of Congress." (338 U.S. at p. 659 [94 L.Ed.2d at p. 429].) Here, as we have seen, there is no clash and no frustration.

F. The Fund urges that legislation enacted in California in 1977 demonstrates that California community property laws "relate to" pension plans within the meaning of section 1144(a), regulate them and conflict with ERISA. The legislation referred to is Statutes 1977, chapter 860.

We note that this legislation, which went into effect on January 1, 1978, is not involved in any of the cases before us. The actions of the trial courts occurred before its operative date. But since the Fund claims that the statute sheds light on how our community property laws affect pension plans, we will consider the point. It is wholly without merit.

Chapter 860 amends two sections of and adds two sections to our statutes dealing with termination of marriage:

(1) It amends Civil Code section 4351 to provide that an order or judgment in a dissolution proceeding can only be enforced against a pension plan if the plan has been joined as a party.[10]

(2) It amends Civil Code section 4363 to provide that a pension plan can be made a party only in accord with section 4363.1.[11]

(3) New Civil Code section 4363.1 sets out the joinder procedure.[12] It gives the pension plan 45 days to respond—a longer period than the norm (see Code Civ. Proc., § 412.20, subd. (a)(3); Cal. Rules of Court, rule 1254(b))—and frees it from paying all filing fees.

[10]Civil Code section 4351 now provides (portion added by 1977 amendment is italicized): "In proceedings under this part, the superior court has jurisdiction to inquire into and render such judgments and make such orders as are appropriate concerning the status of the marriage, the custody and support of minor children of the marriage, the support of either party, the settlement of the property rights of the parties and the award of attorneys' fees and costs; *provided, however, no such order or judgment shall be enforceable against an employee pension benefit plan unless the plan has been joined as a party to the proceeding.*"

[11]Civil Code section 4363 now provides (new material italicized): "The court may order that a person who claims an interest in a proceeding under this part be joined as a party to the proceeding in accordance with rules adopted by the Judicial Council pursuant to Section 4001; *however, an employee pension benefit plan shall be joined as a party to a proceeding under this part only in accordance with the provisions of Section 4363.1.*"

[12]Civil Code section 4363.1 provides:

"(a) Upon written application by a party to a proceeding under this part, the clerk shall enter an order joining as a party to the proceeding any employee pension benefit plan in which either party to the proceeding claims an interest which is or may be subject to disposition by the court. A copy of the joinder request together with a copy of a summons and a blank copy of a notice of appearance both in form and content approved by the Judicial Council shall be served upon the employee pension benefit plan in the same manner as service of papers in civil actions generally. Service of the summons upon a trustee or administrator of the employee pension benefit plan in his capacity as such, or upon any agent designated by the plan for service of process in his capacity as such, shall constitute service upon the employee pension benefit plan.

"(b) A notice of appearance shall be filed and served by the employee pension benefit plan upon the party requesting joinder within 45 days of the date of the service upon the employee pension benefit plan of a copy of the joinder request and summons. The employee pension benefit plan shall indicate in the notice of appearance whether it consents to be governed by the provisions of Section 4363.2. If it fails to do so, the plan shall be deemed not to have consented. Notwithstanding any contrary provision of law, the employee pension benefit plan shall not be required to pay any fee to the clerk of the court as a condition to filing such notice of appearance or any subsequent paper in the proceeding.

"(c) If the employee pension benefit plan has been served and no notice of appearance, notice of motion to quash service of summons pursuant to Section 418.10 of the Code of Civil Procedure, or notice of the filing of a petition for writ of mandate as provided in such section, has been filed with the clerk of the court within the time specified in the summons or such further time as may be allowed, the clerk, upon written application of the party requesting joinder, shall enter the default of the employee pension benefit plan in accordance with Chapter 2 (commencing with Section 585) of Title 8 of Part 2 of the Code of Civil Procedure."

(4) New Civil Code section 4363.2 gives a pension plan which elects to be governed by it an option not to appear at any hearing in the dissolution action and a right, even if it does not appear, to move to set aside or modify any court order aimed at the plan within 30 days.[13]

It is immediately apparent that chapter 860 continues the joinder practice used in two of the cases before us and recognized by *In re Marriage of Sommers, supra. Sommers* was based on California statutory law as it then existed. (53 Cal.App.3d at p. 513.) What chapter 860 evinces is added concern for the practical needs of the pension plans: They cannot be subjected to orders dividing a pension unless they are joined, they are given a longer time to appear than ordinary litigants, they are freed from payment of filing fees and they are given a special option

---

[13]Civil Code section 4363.2 provides:

"(a) An employee pension benefit plan which elects to be governed by the provisions of this section shall not be required to, but may appear at any hearing in any proceeding under this part to which the plan has been joined as a party. For purposes of the Code of Civil Procedure, such plan shall be considered a party appearing at trial with respect to any hearing at which the interest in the plan of the parties is an issue before the court. Those provisions of any order entered in the proceeding which affect a plan electing to be governed by the provisions of this section, or which affect any interest either the petitioner or respondent may have or claim under such plan, shall not become effective until 30 days after the order has been served upon the employee pension benefit plan; provided, however, that the plan may agree in writing to waive all or any portion of the 30-day period. If within the 30-day period, the plan files in the proceeding a motion to set aside or modify those provisions of the order affecting it, such provisions shall not become effective until the court has resolved the motion.

"(b) At any hearing on a motion to set aside or modify an order pursuant to subdivision (a), any party may present further evidence on any issue relating to the rights of the parties under the employee pension benefit plan or the extent of the parties' community or quasi-community property interest in the plan. Any findings of fact or conclusions of law made by the court with respect to the order which is the subject of the motion shall take account of such evidence.

"(c) The grounds upon which the provisions of an order affecting an employee pension benefit plan or the interest of the petitioner and respondent therein shall be set aside or modified shall include, but shall not be limited to, the following:

"(1) Neither petitioner nor respondent has any interest, whether vested or unvested, in the employee pension benefit plan.

"(2) The order grants greater or different rights to the nonemployee spouse, the employee spouse, or the nonemployee spouse and employee spouse combined, than the employee spouse has under the terms of the employee pension benefit plan.

"(3) The order requires payment to the nonemployee spouse of a benefit which under the terms of the plan is only payable on account of or after the death of the employee spouse to a person specified by the terms of the employee pension benefit plan and not selected by the employee spouse.

"(4) The order requires the employee pension benefit plan to make payments in discharge of the nonemployee spouse's interest in the plan after the nonemployee spouse's death.

"(5) The order awards to the nonemployee spouse any of the separate property portion or more than 50 percent of the community and quasi-community property portion of the employee's interest under the employee pension benefit plan."

not to appear at all but nevertheless to retain the right to object to the court's order.[14] But the important point is that chapter 860 does not basically change California practice; it changes only details and those in ways favorable to pension plans.

The Fund nevertheless asserts that compliance with California law is burdensome to it. The Fund claims that in a two-year period it has been joined in twenty-one marital dissolution proceedings. The Fund has 37,000 participants.[15] The Fund does not tell us whether all of these cases resulted in orders against it.[16] Assuming they did, the Fund would ultimately have to mail two monthly checks instead of one in these cases and do the related record keeping. Recognizing that the total number of cases in which the Fund has to do that is likely to increase over the years, the task is, nevertheless, hardly overwhelming. As to appearing in marriage dissolution proceedings, we have seen that chapter 860 does not make the Fund's participation in them more onerous and in most of these proceedings there will be little, if any, need for the Fund to participate actively. The Fund does not contend that the cost of compliance threatens its fiscal integrity; on oral argument the Fund conceded that the cost does not make its compliance with California law economically unfeasible.

## VI

■ Our analysis necessitates the conclusion that in enacting ERISA Congress did not intend to preclude the states from dividing pension rights in marital dissolution proceedings in the manner in which this is done by California courts. Accordingly, we dispose of the cases before us as follows:

### A. *In re Marriage of Campa*

The trial court denied Christine's motion for summary judgment and granted the Fund's motion. The denial is not appealable but may be reviewed on Christine's appeal from the judgment against her. (*Aas* v. *Avemco Ins. Co.* (1976) 55 Cal.App.3d 312, 323 [127 Cal.Rptr. 192]; Code

---

[14]The Fund argues that its fiduciary obligations prevent it from taking advantage of this section. We doubt it: Normally the Fund would have no interest in how the trial court divides the pension rights between the spouses. Be that as it may, the new legislation certainly imposes no added burdens on the Fund.

[15]The number 21 is taken from the Fund's briefs. At oral argument the Fund's counsel stated that the number of such cases was 55.

[16]We noted earlier that upon termination of the marriage, the pension rights are often awarded to the employee-spouse and compensating assets given to the other spouse.

Civ. Proc., § 906.) We have concluded that the Fund has presented no meritorious defense to being made a party. The record reveals no factual disputes between the Fund and Christine. She is, therefore, entitled to summary judgment.

Accordingly, the judgment is reversed with directions to the trial court to enter judgment in favor of Christine and against the Fund.

B. *In re Marriage of Durkin*

The judgment is affirmed.

C. *Bryant* v. *Carpenters Pension Trust Fund*

The judgment is affirmed.

Caldecott, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied on March 1, 1979, the opinion was modified to read as printed above, and the following opinion was then rendered:

THE COURT.—In its petition for rehearing the Fund contends that our opinion conflicts with the decision recently rendered by the United States Supreme Court in *Hisquierdo* v. *Hisquierdo* (1979) 439 U.S. 572 [59 L.Ed.2d 1, 99 S.Ct. 802]. The *Hisquierdo* court reviewed a California marital-dissolution judgment in which the community property law of this state had been applied as the basis for awarding the wife an interest in future pension benefits to be paid the husband under the Railroad Retirement Act. (45 U.S.C.A. § 231 et seq.) The court held that California's community property laws could not support the award because they conflicted with pertinent provisions of the Railroad Retirement Act, which had therefore preempted them by operation of the supremacy clause. (U.S. Const., art. VI, cl. 2; *Hisquierdo, supra,* at p. 590 [59 L.Ed.2d at p. 16].) In a footnote, however, the court expressly distinguished ERISA and established that the decision did not reach it. (*Hisquierdo, supra,* at p. 590, fn. 24 [59 L.Ed.2d at p. 16].) *Hisquierdo* therefore does not affect the present case.

The petition of the appellant Trust Fund for a hearing by the Supreme Court was denied April 12, 1979.