[No. A038122. First Dist., Div. Five. Aug. 30, 1988.]

In re the Marriage of DORITA and WILLIAM BAKER.
WILLIAM BAKER, Respondent, v.
DORITA BAKER, Respondent;
MARINE ENGINEERS BENEFICIAL ASSOCIATION PENSION
TRUST, Appellant.

208

**COUNSEL**

Dennis Daniels for Appellant.

Carol Samuelian Gonella for Respondent Wife.

No appearance for Respondent Husband.

**OPINION**

**KING, J.**—In this case we hold that when a pension plan has been joined as a party in a marital dissolution action and thereafter, despite receipt of a court order awarding the employee's spouse her community property interest in the plan, pays the entire benefit due under the plan to the employee in a lump sum, the plan must pay the employee's spouse her community interest. In reaching this determination we also hold that federal law does not preempt state court action dividing marital interests in employee benefit plans, nor does it require that an action to enforce a state court order dividing such benefits be brought in federal court. Congress, in providing concurrent state court jurisdiction for division of pension benefits, must have intended that the states would prescribe the procedures to be followed in state court actions. For this reason, we hold that federal law does not preempt California's statutory provisions for giving a notice of adverse

interest to the plan and for joinder of the plan as a party in a dissolution action.

The Marine Engineers Beneficial Association (MEBA) Pension Trust appeals from an order requiring it to pay Dorita Baker her community interest in the retirement benefits of her former spouse, William Baker, contending the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.) (ERISA) precludes the state court from issuing such an order. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

William Baker filed for dissolution of marriage to Dorita Baker in August 1979. In October 1982, Dorita obtained an order joining MEBA, William's employee pension benefit plan (29 U.S.C. § 1002(2)(A)(i)), as a party to the dissolution action pursuant to Civil Code section 4363. In December 1982, MEBA filed a notice of appearance and response as allowed by Civil Code section 4363.2, in which it requested, among other things, "That any order directing a divided payment of pension or benefit amounts if any when due be stated in strict percentages per payee respectively and not as a formula or flat amount." On March 5, 1984, by stipulation, William and Dorita's marital settlement agreement dividing their community property was incorporated into a judgment in the California dissolution action. They agreed, apparently in an effort to comply with MEBA's request, to postpone obtaining an order directing MEBA to divide community interests in William's retirement benefits.

The California judgment provided that either party could "request an order from the California court of appropriate jurisdiction that enters its approval of this agreement directing the MEBA Pension Trust to pay directly to Dorita Baker that percentage of the payment allocable to her community interest calculated as follows: one-half of the product obtained by multiplying the amount of each retirement payment by the ratio of the number of months of William E. Baker's employment as a merchant seaman during his marriage to Dorita Baker and prior to separation, which is 319 months over the total number of months of William E. Baker's employment as a merchant seaman credited by the MEBA Pension Trust, which employment commenced April 1, 1952 according to the MEBA pension trust records."

This in-kind division of benefits is commonly called division by the "time rule" and is often utilized in California to divide community interests in pension plans. (See *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 748, fn. 4 [214 Cal.Rptr. 661].) The time rule is most frequently used either to assure each party a source of income upon

retirement, or when the "cash out"[1] method cannot be utilized because it would not result in an equal division of community property. Also, division of pension interests by the time rule makes it unnecessary for either side to employ an actuary for valuation purposes, since the benefits are divided by a formula. Presumably in an effort to comply with MEBA's request that the benefits be divided by a court order "in strict percentages per payee respectively and not as a formula or flat amount," and recognizing that this could not be done until William actually retired, the parties utilized the language set forth in the court order.

Unbeknownst to Dorita, William applied for a lump sum cash out of all retirement benefits on April 2, 1984. On April 5, 1984, Dorita's attorney served MEBA with a copy of the court order (incorporating the stipulated settlement agreement) dated March 5, 1984. Over four months later, on July 10, 1984, MEBA paid William the entire retirement benefit—over $400,000—in a lump sum, without Dorita's knowledge.

In May 1986, Dorita obtained a court order requiring William to pay $165,901.94 as her community share of his pension benefits. In July, unable to collect from William, Dorita sued MEBA for damages in a separate action alleging breach of fiduciary duty, conversion, and negligent and intentional infliction of emotional distress. The trial court sustained MEBA's demurrer on the grounds the complaint failed to state facts sufficient to constitute a cause of action and the court lacked subject matter jurisdiction. No appeal has been filed in that proceeding. Thus there is no issue of damages before us, only Dorita's marital interest in the plan.

In February 1987, Dorita requested and obtained from the court in the dissolution action an order that MEBA pay her $165,901.94 plus 10 percent interest thereon commencing July 10, 1984, until paid in full "as and for her community interest in the pension plan held in the name of William Baker."

## II. CALIFORNIA COMMUNITY PROPERTY LAW NOT PREEMPTED BY ERISA

■ MEBA asserts federal substantive law applies to Dorita's claim under the preemption provision of ERISA, which states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." (29 U.S.C. § 1144(a).) It is well established, however, that section 1144 does not preempt California community property law in general, nor prohibit state courts in dissolution

---

[1]The cash out approach awards the community interest in the plan to the employee, awarding other community assets of equal value to his or her spouse so that an equal division of the community property is accomplished.

actions from ordering pension plans[2] to pay part of a participant's benefits directly to a former spouse. (*Stone* v. *Stone* (N.D.Cal. 1978) 450 F.Supp. 919, 931-933, affd. (9th Cir. 1980) 632 F.2d 740, 742, cert. den. 453 U.S. 922 [69 L.Ed.2d 1004, 101 S.Ct. 3158-3159]; *Carpenters Pension Trust, etc.* v. *Kronschnabel* (C.D.Cal. 1978) 460 F.Supp. 978, 980-982, affd. (9th Cir. 1980) 632 F.2d 745, cert. den. 453 U.S. 922 [69 L.Ed.2d 1004, 101 S.Ct. 3159]; *Johns* v. *Retirement Fund Trust* (1978) 85 Cal.App.3d 511, 513 [149 Cal.Rptr. 551]; *In re Marriage of Johnston* (1978) 85 Cal.App.3d 900, 905-912 [149 Cal.Rptr. 798]; *In re Marriage of Campa* (1979) 89 Cal.App.3d 113, 120-125 [152 Cal.Rptr. 362], app. dism. for want of substantial federal question 444 U.S. 1028 [62 L.Ed.2d 664, 100 S.Ct. 696]; *In re Marriage of Pilatti* (1979) 96 Cal.App.3d 63 [157 Cal.Rptr. 594]; *In re Marriage of Lionberger* (1979) 97 Cal.App.3d 56, 64-66 [158 Cal.Rptr. 535]; *In re Marriage of Mantor* (1980) 104 Cal.App.3d 981, 985 [164 Cal.Rptr. 121]; *In re Marriage of Williams* (1985) 163 Cal.App.3d 753, 761-762 [20 Cal.Rptr. 827].)

As noted in *Kronschnabel,* the United States Supreme Court's action in dismissing the appeal in *Campa* for want of a substantial federal question is a decision on the merits that ERISA does not preempt state court orders directing a plan to pay a community property share of a participant's benefits to his or her ex-spouse. As a decision on the merits by our nation's highest court, it is binding on all state and federal courts.

MEBA cites no cases holding that the California court order awarding Dorita her community property interest in William's pension is preempted by ERISA.

 MEBA also claims ERISA's provision that "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated" (29 U.S.C. § 1056(d)(1)) prohibits it from complying with the trial court's order. Numerous cases have held, however, that the general anti-alienation provision does not prohibit the division of pension benefits under community property laws. (*Stone* v. *Stone, supra,* 450 F.Supp. at pp. 924-931, *Carpenters Pension Trust, etc.* v. *Kronschnabel, supra,* 460 F.Supp. at p. 982, *Johns* v. *Retirement Fund Trust, supra,* 85 Cal.App.3d at p. 513, *In re Marriage of Johnston, supra,* 85 Cal.App.3d at pp. 912-913, *In re Marriage of Campa, supra,* 89 Cal.App.3d at pp. 125-126, *In re Marriage of Pilatti, supra,* 96 Cal.App.3d at p. 67, *In re Marriage of Williams, supra,* 163 Cal.App.3d at pp. 760-762.)

---

[2] ERISA uses the phrase "employee benefit plans" to describe its coverage. California statutes use the term "employee pension benefit plans" as defined in Civil Code section 4363.3. For the purposes of this appeal of an order involving a pension or retirement plan, which is included under either term, we shall hereafter utilize the word "plan" to include both. In other contexts it appears that ERISA governs types of benefits not covered by 4363.3. We also use the term "plan" to describe the plan as well as the plan's administrator or trustee.

ERISA defined an employee, and it defined a beneficiary as one designated by the employee or the terms of the plan who may become entitled to receive benefits under the plan. (29 U.S.C. § 1002.) A former spouse was not included in either definition, nor was there a reference specifically to a former spouse. Thus it could have been argued that under ERISA, as originally enacted, "Technically, an employee's former spouse, whose interest in the benefits arise by operation of community property law, is neither an employee nor a beneficiary. Distribution to such persons therefore may run afoul of the exclusive benefit rule." (Solomon, *Beyond Preemption: Accommodation of the Nonemployee Spouse's Interest Under ERISA* (1980) 31 Hastings L.J. 1021, 1041.)

In 1984 Congress enacted the Retirement Equity Act (REA) amending ERISA to provide, among other things, that the anti-alienation provision "shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that [it] shall not apply if the order is determined to be a qualified domestic relations order," as defined in subsequent subparagraphs. (29 U.S.C. § 1056(d)(3)(A).) Thus, a QDRO was born.[3] ■ The objective of REA, according to its legislative history, is "to *clarify* existing law, acknowledged to be divergent, by creating a specific limited exception that permits pension benefits to be divided under certain well-defined guidelines." (*In re Marriage of Williams, supra,* 163 Cal.App.3d at pp. 765-766; italics added.) The fact that REA's enactment was intended to clarify existing law as contained in ERISA is highly significant. The *Williams* court found no intent to condemn former case law permitting distribution of pension benefits to former spouses to satisfy support obligations. There is certainly nothing in REA or its legislative history which indicates any disagreement with the United States Supreme Court's determination—by dismissing the appeal in *Campa* for lack of a federal question—that state courts are not preempted by ERISA from dividing community property interests in plans in a marital dissolution action.

■ MEBA does not explain or offer any authority for its contention that REA was meant to invalidate longstanding community property law governing the division of pension benefits between divorcing spouses. It merely asserts the challenged order is not "qualified," i.e., not a QDRO, because it "require[s] the plan to provide increased benefits (determined on the basis of actuarial value)" (29 U.S.C. § 1056(d)(3)(D)(ii), since all William's benefits have already been distributed to him. But the order does not require the plan to provide increased benefits; it only requires the distribution of accrued benefits owned by Dorita as her share of the community

---

[3] Hereafter, a "qualified domestic relations order" will be referred to as a QDRO, pronounced "quadro," as it is commonly referred to by family law practitioners.

interest in the plan. (*Phillipson* v. *Board of Administration* (1970) 3 Cal.3d 32 [89 Cal.Rptr. 61, 473 P.2d 765]; disapproved on other grounds in *In re Marriage of Brown* 15 Cal.3d 838, 851, fn. 14 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164].) If, as MEBA claims, it has "inadvertently and wrongfully paid" William Dorita's share, the remedy for its error is to bring an action against William for the overpayment to him, not to continue to withhold from Dorita what is rightfully hers.[4]

The cases cited by MEBA (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85 [77 L.Ed.2d 490, 103 S.Ct. 2890], *Massachusetts Mutual Life Ins. Co.* v. *Russell* (1985) 473 U.S. 134 [87 L.Ed.2d 96, 105 S.Ct. 3085], *Pilot Life Ins. Co.* v. Dedeaux (1987) 481 U.S. 41 [95 L.Ed.2d 39, 107 S.Ct. 1549], *Providence* v. *Valley Clerks Trust Fund* (1984) 163 Cal.App.3d 249 [209 Cal.Rptr. 276]) do indeed teach that the "scope of ERISA preemption is very expansive." None, however, is a family law case dividing marital interests, or purports to contradict the long line of cases upholding orders like the one at issue here.

### III. EFFECT OF ERISA ON CALIFORNIA PROCEDURE

REA became operative for most purposes on January 1, 1985, while the order in the dissolution action dividing the parties' marital interests in William's plan was issued in March 1984. MEBA's appeal is from the court's order of January 1987 requiring MEBA to pay Dorita $165,901.94 plus 10 percent interest commencing July 10, 1984, as her community interest in the plan. The parties assume ERISA, as amended by REA, governs the issues in this case, either because the order appealed from was issued after REA became effective or because REA's legislative history makes clear its enactment was for the purpose of clarifying ERISA. We assume, without deciding, that the parties are correct.[5]

 Having determined that California courts have jurisdiction under ERISA to divide marital interests in employee benefit plans in dissolution actions, the remaining issue is the ability of the California Legislature to prescribe the procedure for doing so. To put this issue in context, we briefly describe the procedure adopted for California courts to acquire jurisdiction over the plan, to determine and divide the marital property interests of the

---

[4] MEBA does not maintain it did not know the contents of the March 5, 1984, order dividing the Bakers' community property, but insists the question of whether that order gave rise to any duties which it might have breached is an ERISA issue adjudicable only in federal court. The trial court expressly considered whether the March 5th order was sufficient notice to MEBA of Dorita's community interest. MEBA does not challenge the sufficiency of the evidence to support the implied finding that it was.

[5] We do not mean to suggest the result would be different if the parties' assumption is incorrect.

parties in the plan, and to enforce their orders so that each party receives his or her community interest.

Two methods have been provided by the Legislature. As far back as 1949 the predecessor statute to Civil Code section 5106 provided a procedure by which a nonemployee spouse could give a plan a written notice of adverse interest in benefits of the plan, and provided the plan had no liability to the nonemployee spouse for payments to the employee made prior to the receipt of such notice. This statute, amended in 1976 to refer to ERISA upon its enactment, is still effective, although some family law practitioners have questioned whether, in effect, it has been superseded by the subsequent adoption of the statutory provisions for joinder of plans.

In 1977 the Legislature amended Civil Code sections 4351 and 4363 and enacted sections 4363.1 through 4363.3. Section 4351, which specified the scope of jurisdiction under the Family Law Act, was amended to provide that no order or judgment in a family law proceeding "shall be enforceable against an employee pension benefit plan unless the plan has been joined as a party to the proceeding." Section 4363, the statutory authority for joining someone other than a spouse as a party to a dissolution proceeding, was amended to provide that "an employee pension benefit plan shall be joined as a party to a proceeding under this part only in accordance with the provisions of Section 4363.1." This amendment undoubtedly occurred because the procedure for joinder under section 4363, requiring a motion before the court, was somewhat cumbersome and the motion for joinder of a plan in which there was a community property interest was always granted. Additionally, once joined, the plan was treated like any other party to litigation with the necessity of fully participating in the action.

Section 4363.1 prescribes a simplified procedure for joinder, limited to employee benefit pension plans, using Judicial Council forms.[6] In sum, a form request for joinder is presented to the clerk who enters an order joining the plan; service of appropriate forms is then made on the plan. Section 4363.2 provides the alternatives the plan can take upon being served. In practice, unlike in the instant case, the plan usually files nothing, but just awaits the issuance of a court order directing how the benefits should be distributed. Section 4363.2 also provides that the plan is bound by the court's order awarding the community interests in the plan. (For a more detailed discussion of the procedure under California's joinder statutes, see

---

[6] Indeed, the motivation for changing the joinder procedure for plans and the proposal for joinder came from the plans. The procedure proposed and ultimately adopted does not require a plan to do anything, whereas the former procedure raised questions of whether the plan had to participate actively as a party in the dissolution action, represented by counsel. This was unnecessary because plans were nothing more than stakeholders awaiting directions by an appropriate court order.

Hogoboom and King, Cal. Practice Guide—Family Law, 1 section 8:257 et seq.) Finally, the 1977 legislation created section 4363.3, which defined an "employee pension benefit plan."

Having determined that ERISA does not preempt California courts from dividing marital interests in plans in a dissolution proceeding and thereafter enforcing their orders, and having discussed California's statutory procedures with regard to plans, it is necessary to look to ERISA to determine if it preempts all or any of California's procedure.

A reading of ERISA as originally enacted in 1974, and its legislative history, leads one to conclude that Congress had important goals in mind but did not fully appreciate the way in which the subject matter related to the significant increase in the divorce rate which had been taking place over the previous quarter century. ERISA contains congressional findings and a declaration of policy which make it clear the primary purpose of the legislation was to protect the economic security and well-being of the millions of American workers covered by plans. It did so by providing greater protection for employees by stricter regulation of the operations and management of plans, requiring increased reporting about plan operations, providing greater legal remedies to covered employees, and specifying minimum requirements for vesting of benefits and the funding of plans. (See 29 U.S.C. § 1001.)

Perhaps the clearest example of how little thought was given to what happened to marital interests in plans upon the dissolution of a marriage was the enactment of a requirement that those plans making benefits available in the form of an annuity for the employee had to provide for an option of a joint and survivor annuity which is "for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of . . . the amount of the annuity which is payable during the joint lives of the participant and the spouse. . . ." (29 U.S.C. § 1055(d)(1).) One of the most respected family law commentators has written about this section, "[t]he legislative history indicates that no thought at all was given to the effect of the provision in the context of division of property at divorce." (Reppy, Community and Separate Interests in Pensions and Social Security Benefits After *Marriage of Brown* and ERISA, (1978) 25 UCLA L.Rev 417, 519, fn. omitted.) This was the most logical place within ERISA where this issue could have been considered, but it was not.

"Through enactment of the Retirement Equity Act of 1984, Congress has attempted to protect pension rights of the nonemployee spouse and to ensure an equitable division of property in a divorce." (Kalcheim & Shapiro, *Does the Order Pass the Test?* (1985) 8 Family Advocate 20, 23.) The clearest demonstration of a congressional scheme in REA to divide marital

interests in plans upon dissolution was its amendment of 29 United States Code section 1056 to provide that the provisions of this section prohibiting assignment or alienation of the benefits of a plan shall not apply if the benefits are ordered payable pursuant to a QDRO, as defined within that section. (29 U.S.C. § 1056(d)(3)(A).) REA, for the first time, provided within ERISA for the rights of an "alternate payee," which was defined as "any spouse, *former spouse,* child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." (29 U.S.C. § 1056(d)(3)(K); italics added.) REA equated an alternate payee under a QDRO for all purposes with a beneficiary as defined in ERISA as originally enacted. (29 U.S.C. § 1056(d)(3)(J).) This provided alternate payees the same rights as beneficiaries to enforce their interests in plans.

REA made two other significant changes for the benefit of former spouses. As originally enacted, ERISA provided that *if* a plan provided its benefits in the form of an annuity, it had to offer a joint and survivor annuity. REA made an important change by requiring that all plans covered by ERISA[7] had to offer a qualified joint and survivor annuity (29 U.S.C. § 1055(a)), in which the survivorship benefit had to be at least 50 percent of the employee's benefit (29 U.S.C. § 1055(d)(1)), and this annuity could only be waived by a spouse or former spouse in writing. (29 U.S.C. § 1055(c)(2)(A)(i).) This is a significant benefit since it provides an income to a divorced spouse even after the death of his or her former spouse.

Finally, REA, in effect, adopted California's *Gillmore* rule (see *In re Marriage of Gillmore* (1981) 29 Cal.3d 418 [174 Cal.Rptr. 493, 629 P.2d 1]) by providing that in all ERISA plans, a former spouse was entitled to begin receiving payments of his or her interest in the plan when the employee became eligible to retire, even though the employee continued to work. (29 U.S.C. § 1056(d)(3)(E).)

■ In sum, REA provides for equality of treatment of former spouses awarded an interest in a plan under a QDRO and present spouses, both in their right to receive their respective interests in plans and in their right to enforce that interest pursuant to 29 United States Code section 1132.

With the enactment of REA, Congress has clearly declared its intent that state courts in a marital dissolution action can issue an order which, if a QDRO, is binding upon the plan administrator, even though the plan is not a party to the action in which the order is issued. ■ In other words,

---

[7] Although most private plans are governed by ERISA, governmental plans are not. For a specification of which plans are or are not governed by ERISA, see 29 United States Code section 1003.

under ERISA it is not necessary that a plan be a party to a state court action in order to be bound by the court's order dividing the marital interests in the plan.[8]

With this background, we now reach the final issue: Given the clear declaration of intent in 29 United States Code section 1144 that ERISA supersede state laws relating to plans, and the equally clear authorization for state courts to divide marital interests in such plans, is California's statutory procedure for a notice of adverse interest and/or joinder preempted by ERISA? We hold that it is not, except that when a plan has been joined as a party to a California dissolution action, the court's order dividing marital interests in the plan must be a QDRO or it is not binding or enforceable against the plan. To the extent Civil Code sections 4351 or 4363.2 provide a plan is bound by a California order dividing marital interests in the plan which is not a QDRO, it is preempted by ERISA.

We now discuss how we reach our conclusion. In *In re Marriage of Campa, supra,* 89 Cal.App.3d at page 116, where the plan had been joined as a party under California's statutory procedure, the issue presented was whether ERISA "precludes California courts from joining pension funds in marriage dissolution proceedings and from ordering such funds to divide pension payments between the employee and his or her former spouse." We have previously noted that the decision of the United States Supreme Court dismissing the appeal in *Campa* for lack of a federal question was a decision on the merits. Thus the United States Supreme Court has determined that California courts are not preempted by ERISA from dividing marital interests in a plan in a dissolution action. The Court has also determined that joinder of the plan under California's joinder procedure is not preempted by ERISA. The subsequent clarifying amendments to ERISA by enactment of REA make clear, as previously discussed, congressional intent supporting this determination.

REA was adopted in part to protect the interests of nonemployee spouses. Without the benefit of a written notice of adverse interest to the plan pursuant to Civil Code section 5106, the nonemployee spouse would have no way of protecting his or her marital interest in the plan until a QDRO could be obtained from the court. Since there is a substantial delay between the filing of a dissolution action and obtaining a judgment dividing

---

[8] A fundamental principle of law is that a judgment cannot be had without notice to the person to be bound, and an opportunity to be heard. (See *Sniadach v. Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]; *Randone v. Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13].) However, since the plan is a fiduciary acting as a stakeholder, Congress determined there is no reason for a plan to participate in a dissolution action, although it should be bound by the state court's order dividing marital interests in the plan's benefits. Obviously, if an order for attorney fees against the plan were sought, the plan would have to be a party to the dissolution action.

community property interests, during this hiatus, especially if a bifurcation of marital status was granted, the employee could apply for a lump sum payment of all benefits and deprive the nonemployee spouse of his or her interest unless there is an ability to provide notice of an adverse interest to the plan. (See *In re Marriage of Allison* (1987) 189 Cal.App.3d 849 [234 Cal.Rptr. 671].)

Additionally, the plan has fiduciary duties to be discharged solely in the interests of the employee and beneficiaries, including former spouses, pursuant to 29 United States Code section 1104. California's procedure for service of a written notice of adverse interest by a nonemployee spouse upon the plan allows the plan to discharge properly its fiduciary responsibilities. The plan might not even know it had any fiduciary duty to a nonemployee spouse until it received notice of the claim of the nonemployee of an interest in the plan adverse to the employee.

The procedure for joinder of a plan as a party to the marital dissolution proceeding prescribed by Civil Code sections 4363 through 4363.2 is the procedure most commonly used by counsel in California dissolution cases. Joinder of plans is not preempted by ERISA. This procedure places no burden on a plan, since the mere service of an order of joinder and other Judicial Council forms required by California's statutory scheme does not require the plan to do anything, except withhold payment of benefits claimed by the nonemployee spouse pending receipt of a QDRO. As is true with the notice of adverse interest, joinder of the plan carries out the intent of Congress to protect the marital interests of spouses and former spouses in such plans until the state court can issue a QDRO. Joinder also gives the court jurisdiction over the plan for the purpose of awarding attorney fees against the plan pursuant to 29 United States Code section 1132(g) when appropriate under Civil Code section 4370.[9] (*In re Marriage of Olivarez* (1986) 188 Cal.App.3d 336 [232 Cal.Rptr. 794].) Likewise, a plan would have to be joined in order to be bound by an injunctive order in the dissolution action, such as one prohibiting the plan from honoring an election by the employee diminishing his or her spouse's benefits in the plan. (See 29 U.S.C. § 1451; *In re Marriage of Lionberger, supra,* 97 Cal.App.3d 56.)

However, those portions of the Civil Code which would purport to make an order dividing marital interests in the plan effective against the plan are obviously preempted by the QDRO provisions of ERISA. Thus, only if the state court order is a QDRO is it exempt from the anti-alienation provisions of ERISA, even if the plan has been joined as a party to the dissolution action. (29 U.S.C. § 1056.)

To summarize, Congress, in enacting ERISA as amended by REA, has clearly declared its intent that state courts have jurisdiction to divide and

---

[9] See footnote 8, *ante.*

enforce the division of marital interests in employee benefit plans. The federal statutory scheme binds the plan to distribute benefits pursuant to a state court order which is a QDRO, even though the plan is not a party to the dissolution action. In furtherance of congressional intent to protect the rights of separated and divorced spouses' interest in such plans, it is proper for states to establish the procedure by which the interests of the spouses and former spouses will be determined and to provide safeguards to ensure that plans do not distribute the interest of the nonemployee to the employee spouse prior to the issuance of a QDRO. Since Congress has clearly declared its intent to allow state courts to divide marital interests in employee benefit plans, it certainly follows that Congress intended to give states the means to assure that nonemployee spouses obtain the benefits which belong to them. California's joinder and notice procedures operate in furtherance of that congressional intent. Without them, a gap would exist between the date of separation and the issuance of a QDRO during which the nonemployee spouse's property rights in a plan would be jeopardized.

## IV. FEES AND COSTS

 MEBA failed to discharge its duties to Dorita when it paid benefits to William with knowledge from the court order that they belonged to Dorita. In this action for enforcement of her benefits, Dorita requests that she be awarded attorneys fees and costs. She is entitled to them pursuant to 29 United States Code section 1132(g) and Civil Code section 4370. (See *In re Marriage of Olivarez, supra,* 188 Cal.App.3d 336.)

## V. DISPOSITION

The judgment is affirmed. Respondent shall recover her costs on appeal, including reasonable attorneys fees to be fixed by the trial court.

Low, P. J., and Haning, J., concurred.