[No. S055819. July 28, 1997.]

In re the Marriage of MARY K. and JAMES M. ODDINO.
MARY K. ODDINO, Appellant, v.
JAMES M. ODDINO, Respondent;
HUGHES AIRCRAFT COMPANY NON-BARGAINING RETIREMENT
PLAN, Respondent.

COUNSEL

Glasser and Smith and Robert Glasser for Appellant.

No appearance for Respondent Husband.

O'Melveny & Myers, Stephen J. Pepe, Wayne S. Jacobsen, Todd R. Wulffson and Larry A. Walraven for Respondent Hughes Non-Bargaining Retirement Plan.

Thomas S. Williamson, Jr., J. Davitt McAteer, Marc I. Machiz, Daniel W. Teehan, Paula J. Page, Theresa Gee, Karen L. Handorf, Barbara A. Matthews, Bettina Redway, Paul, Hastings, Janofsky & Walker, Ethan Lipsig, Proskauer, Rose, Goetz & Mendelsohn and Jeffrey A. Berman as Amici Curiae on behalf of Respondent Hughes Non-Bargaining Retirement Plan.

---

OPINION

**WERDEGAR, J.**—Under provisions of the federal Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.; hereafter ERISA), private retirement plans may, pursuant to a state court's domestic relations order, pay a portion of an employee participant's retirement benefits directly to the employee's former spouse or dependents, if and only if the state court order meets certain specifications. Such an order is a "qualified domestic relations order" (hereafter a QDRO). (29 U.S.C. § 1056(d)(3).)[1]

In this case, we address two questions relating to ERISA and the division of private retirement benefits in a marital dissolution action. First, do the California courts have subject matter jurisdiction to decide whether a superior court's order assigning retirement benefits to the nonemployee spouse is a QDRO? Our answer is *yes*: State and federal courts have concurrent jurisdiction over that question under section 1132(e)(1). Second, does an order qualify as a QDRO if it requires the retirement plan to pay the nonemployee spouse a portion of the employee spouse's early retirement benefits without any actuarial reduction, where the employee spouse is eligible for such unreduced benefits upon early retirement but has not yet retired? We answer this question *no*: Such unreduced early retirement benefits include an employer subsidy for early retirement, which, under section 1056(d)(3)(E)(i)(II), may not be paid pursuant to a QDRO if the employee spouse has not separated from service.

---

[1]All further statutory references are to title 29 of the United States Code, unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

The marriage of Mary K. and James M. Oddino was dissolved by the superior court in an interlocutory judgment filed January 19, 1983. During the marriage, James was employed by the Hughes Aircraft Company (Hughes) and participated in the Hughes Aircraft Company Non-Bargaining Retirement Plan (the Plan), which is administered by Hughes. In the interlocutory judgment, Mary was awarded "that portion of [James's] retirement benefits payable, upon date of retirement, pursuant to the formula in *Brown*."[2] On March 24, 1989, pursuant to a stipulation by James and Mary, the court modified its judgment by determining more exactly Mary's share of the retirement benefits (36.6231 percent) and specifying that payments to Mary were to be determined "as if [James] had retired on April 1, 1988," and were to begin "as of" April 1, 1988, or as soon as practical thereafter. April 1, 1988, was James's 55th birthday. At the time of this order, James was still working at Hughes.

On June 1, 1989, the Plan's administrator informed Mary and James the superior court order was a QDRO. The administrator noted, however, that the Plan interpreted the order as not mandating that payments to Mary include "the 'early retirement subsidy.' " In calculating the benefit to be paid Mary, the Plan reduced the monthly annuity amount, which was based on the annuity payable to James on retirement at age 65, by a factor of .4322. This reduction was to account for the fact monthly payments to Mary would begin before James's 65th birthday and would be paid for a longer period. The calculated benefit was, according to the Plan, "equal in actuarial value" to a benefit paid beginning on James's 65th birthday. The actuarial factor reduced Mary's payments, under the 60-month payout option she chose, from $3,618 to $1,564 per month. The Plan began making payments to Mary at the reduced rate in early 1990.

Under the terms of the Plan, an employee who retires at or after age 55, and the sum of whose age and years of service is at least 75, is entitled to a benefit calculated without actuarial reduction, i.e., an annuity in the same periodic amount as if he or she had retired at age 65. This is known as the "Rule of 75." An employee who retires before age 55, or an employee who retires between the ages of 55 and 65 and whose age and years of employment do not total at least 75, is entitled only to an early retirement benefit reduced to the actuarial equivalent of the age 65 benefit. Had James retired on or after April 1, 1988, he would have been entitled to full benefits under the Rule of 75.

---

[2]The court's reference was apparently to *In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164]. (See *In re Marriage of Judd* (1977) 68 Cal.App.3d 515, 522 [137 Cal.Rptr. 318].)

In March 1990, dissatisfied with the actuarially reduced payments, Mary joined the Plan in the marital dissolution action (see Fam. Code, § 2060) and sought an order requiring the Plan to pay her benefits calculated under the Rule of 75. The Plan opposed such an order on the ground it would not be a QDRO, and the Plan would therefore be forbidden under ERISA from making any payments to Mary under it.

The superior court denied the relief Mary requested, finding that the Rule of 75 "constitutes a subsidy rather than an accrued benefit," and is therefore "not payable to a spouse prior to the actual retirement of the working spouse." The Court of Appeal reversed and directed the superior court to order the Plan to pay Mary benefits under the Rule of 75. The appellate court held the Rule of 75 was not an employer subsidy, but was instead "the normal retirement benefit when the criteria of 75 years are met." For that reason, the court held, the superior court order would remain a QDRO even if construed to require the payment of unreduced benefits. We granted the Plan's petition for review.

## DISCUSSION

### I. *Subject Matter Jurisdiction*

 The Plan contends the Court of Appeal was without jurisdiction to decide that the superior court order of March 1989, interpreted as requiring payment of Rule of 75 benefits to Mary before James's retirement, is a QDRO. The Plan's contention is based on its broader claim, endorsed as well by amicus curiae the United States Department of Labor (DOL), that federal courts have exclusive jurisdiction over the question whether a state court domestic relations order is "qualified" under ERISA.

The question of state court subject matter jurisdiction was not raised by the parties in either of the lower courts and was not addressed by the Court of Appeal; the Plan objected on jurisdictional grounds for the first time in its petition for review. As a matter of fundamental jurisdiction affecting the power of the lower courts to act, however, the issue must be addressed. (*Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 721 [73 Cal.Rptr. 213, 447 P.2d 325].)

We may properly address the question in the general form in which the parties discuss it: Does a state court have jurisdiction to determine that a domestic relations order is "qualified" under ERISA? Although neither the superior court nor the Court of Appeal directly ordered the Plan administrator to consider the March 1989 order a QDRO when construed as mandating

payment under the Rule of 75, such a result was implicit in the Court of Appeal's direction that the administrator be ordered to pay Mary the Rule of 75 benefits. As the Court of Appeal recognized, the administrator could not, under the applicable provision of ERISA (§ 1056(d)(3)(A)), legally pay such benefits except pursuant to a QDRO. The Court of Appeal's command that the superior court order Mary to be paid Rule of 75 benefits was thus necessarily premised on the court's holding that such an order would be a QDRO.

The dispute over subject matter jurisdiction centers on a provision of ERISA giving the federal courts exclusive jurisdiction over some ERISA-related actions and giving state courts jurisdiction, concurrent with that of the federal courts, over others. Section 1132(e)(1) states a general rule of exclusive federal jurisdiction for actions brought under ERISA and provides a single possibly applicable exception—"actions under subsection (a)(1)(B) of this section"—as to which state and federal courts have concurrent jurisdiction.[3] Section 1132(a)(1)(B), in turn, authorizes actions by a retirement plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Subsection (a)(3) of the same section authorizes participants and beneficiaries to bring civil actions to enjoin violations of ERISA or of the plan's terms, to obtain other equitable relief or redress for such violations, or to enforce provisions of ERISA or the plan.[4]

Mary contends her request for relief against the Plan was in the nature of an action to recover benefits due her under the terms of the plan—specifically, benefits calculated pursuant to the plan's Rule of 75—and to clarify her right to such future benefits. It was therefore brought, Mary argues, under section 1132(a)(1)(B), and thus was the subject of concurrent state-federal jurisdiction under section 1132(e)(1). Mary relies on the only published decisions directly addressing this question, both of which arose out of

---

[3] Section 1132(e)(1) provides in full: "Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section."

[4] Section 1132(a) provides, in pertinent part: "A civil action may be brought—[¶] (1) by a participant or beneficiary—[¶] (A) for the relief provided for in subsection (c) of this section, or [¶] (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; [¶] (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [¶] (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this subchapter or the terms of the plan; . . ."

the same disputed marital property order and both of which were decided in favor of concurrent state jurisdiction. (*In re Marriage of Levingston* (1993) 12 Cal.App.4th 1303 [16 Cal.Rptr.2d 100] (*Levingston I*); *Board of Tr. of Laborers Pension Tr.* v. *Levingston* (N.D.Cal. 1993) 816 F.Supp. 1496 (*Levingston II*).) On the other hand, the Plan, supported by DOL, maintains Mary is seeking to enforce a provision of ERISA, to wit, the section requiring a plan administrator to determine if an order is a QDRO; her action therefore is brought pursuant to section 1132(a)(3) and is exclusively within the jurisdiction of the federal courts under section 1132(e)(1). The Plan does not cite any case authority directly supporting its position, but argues both *Levingston* decisions are contrary to the text and intent of ERISA.

Some background on ERISA's QDRO provisions will be helpful to our discussion. As originally enacted in 1974, ERISA was silent on the question whether its preemption (§ 1144) and anti-alienation (§ 1056(d)) provisions prevented state courts from assigning portions of an employee spouse's retirement benefits to a nonemployee spouse pursuant to state law on division of marital property or obligations of support. Courts generally held such orders were not preempted and did not violate the anti-alienation provision. (See, e.g., *Carpenters Pension Trust, etc.* v. *Kronschnabel* (9th Cir. 1980) 632 F.2d 745, 747-749; *In re Marriage of Johnston* (1978) 85 Cal.App.3d 900, 910-912 [149 Cal.Rptr. 798]; *Evans* v. *Evans* (1993) 111 N.C.App. 792 [434 S.E.2d 856, 859] [citing cases].) In 1984, however, Congress acted to eliminate any uncertainty by spelling out the types of state court domestic relations orders plan administrators may honor. The 1984 ERISA amendments, also known as the Retirement Equity Act (REA), defined QDRO's (§ 1056(d)(3)(B)(i)) and exempted such orders from the preemption and anti-alienation provisions (§§ 1144(b)(7), 1056(d)(3)(A)). In addition, Congress gave the status of plan beneficiaries to former spouses and dependents of plan participants who have received, in a QDRO, rights to any of the participant's benefits ("alternate payees" as defined in § 1056(d)(3)(K)), thus allowing them to enforce their rights to benefits. (§ 1056(d)(3)(J).)

Through these and other provisions, Congress sought to protect the rights of nonemployee spouses and dependents by allowing state courts to make equitable divisions of property in a divorce or dissolution and provision for support of dependents. (*Boggs* v. *Boggs* (1997) __ U.S. __ [117 S.Ct. 1754, 138 L.Ed.2d 45]; *In re Marriage of Baker* (1988) 204 Cal.App.3d 206, 216-217 [251 Cal.Rptr. 126]; H.R.Rep. No. 655, 98th Cong., 2d Sess., p. 25 (1984) [REA's primary goals include providing "adequate safeguards for spouses not employed outside the home"]; Sen.Rep. No. 575, 98th Cong., 2d Sess., p. 1 (1984), reprinted in 1984 U.S. Code Cong. & Admin. News, p. 2547 (hereafter the 1984 Senate Report) [REA will amend ERISA to

account for "the status of marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home"].)

Under section 1056(d)(3)(G)(i), the plan administrator makes the initial determination whether a domestic relations order received by the plan is a QDRO. REA contemplates possible judicial review of that determination in "a court of competent jurisdiction" (§ 1056(d)(3)(H)(i)), but does not specify the procedure for obtaining such review or the court or courts having jurisdiction. Hence, the parties have turned, as we must also, to the original ERISA provision on jurisdiction, section 1132(e)(1). As already explained, under that provision the existence of state jurisdiction depends upon whether an action to require payments, pursuant to a domestic relations order of disputed qualification, is properly considered an action by a beneficiary to recover, enforce rights to, or clarify future benefits under the terms of a plan, within the meaning of section 1132(a)(1)(B).

In *Levingston I*, the Court of Appeal held a nonemployee spouse seeking an order that a plan pay benefits as set out in a disputed QDRO was pursuing an action under section 1132(a)(1)(B), within the jurisdiction of the superior court that issued the disputed QDRO. In seeking a payout in the form of an annuity for her own life, rather than a joint and survivor benefit based on the life of her former husband and his new wife, the former wife sought "clearly to recover benefits she claims are due her, to enforce her rights and to clarify her rights to future benefits." (*Levingston I, supra*, 12 Cal.App.4th at p. 1306.)

In addition to the language of section 1132(a)(1)(B), the *Levingston I* court relied on the congressional purpose in REA, i.e., to protect the retirement benefit rights of nonemployee spouses and to provide a practical means by which those benefits could be recovered. "There already is a state court action, the marital dissolution action, to which the plan is a party. Thus, a motion in that court is simple, inexpensive and expeditious. We do not believe Congress, having given state courts the power to issue orders determining and dividing marital rights in retirement plans, would require a separate federal court proceeding to decide whether or not the order is a QDRO. This would cause undue hardship, expense and delay to the affected party, and impose an unnecessary workload on already overburdened federal courts." (*Levingston I, supra*, 12 Cal.App.4th at p. 1306.)

The Plan attacks the decision in *Levingston I* on two related grounds. First, the Plan argues, the court's assertion the nonemployee spouse is seeking "to recover benefits" ignores the precise language of section 1132(a)(1)(B),

which refers specifically to an action to recover benefits, enforce rights, or clarify future benefits *"under the terms of the plan."* (Italics added.) The Plan reasons that because determination of QDRO status depends on interpretation of ERISA's QDRO provisions, a nonemployee spouse seeking such a determination is asking for enforcement of ERISA, rather than the payment of benefits due "under the terms of the plan." Second, the Plan relies on legislative history from the 1974 enactment of ERISA demonstrating, in the Plan's view, that actions under section 1132(a)(1)(B) were not expected to involve the interpretation of ERISA's substantive provisions.

Considering first the linguistic point, we disagree with the Plan's assertion that Mary and other nonemployee spouses in like circumstances are seeking to enforce ERISA rather than to obtain benefits under the terms of retirement plans. The superior court's interlocutory judgment divided the community property by giving Mary a specified share of the retirement benefits James had earned through his employment at Hughes. Those benefits are, of necessity, benefits due under the terms of the Plan, which is the only source of retirement benefits to James. The Plan, by its terms, authorizes the payment of part of a participant's benefits to an alternate payee pursuant to a QDRO. A state court domestic relations order, moreover, can be a QDRO *only* if it does not require a plan to pay "increased benefits (determined on the basis of actuarial value)" or "any type or form of benefit" other than those available under the plan. (§ 1056(d)(3)(D).) Thus Mary may not claim that she is entitled to greater benefits under any part of ERISA, including the QDRO provisions, than were provided to her and James under the terms of the Plan.

Nor can Mary be said to seek benefits through enforcement of ERISA under section 1132(a)(3). The QDRO provisions added to ERISA by REA do not independently provide former spouses or dependents with rights to any retirement benefits. Rather, they constitute only an *exception* to the general anti-alienation rule of section 1056(d)(1), *allowing* plan administrators to make payments, under specified circumstances, to alternate payees *if ordered to do so* by a state court. To the extent former spouses and dependents have rights in a participant's retirement benefits, those rights derive not from ERISA, but from state domestic relations law. Thus, a former spouse like Mary, who seeks enforcement of a state court order giving her a right to a portion of the participant's plan benefits, is not seeking to enforce ERISA, but to obtain benefits she claims are due her under the terms of the plan and the state court order.

The Plan's legislative history argument rests on a congressional conference report from the 1974 enactment of ERISA. (H.R. Conf. Rep. No. 1280,

93d Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News, p. 5038 (hereafter the 1974 Conference Report).) Discussing the provisions that became sections 1132(a) and 1132(e), the 1974 Conference Report states: "The U.S. district courts are to have exclusive jurisdiction with respect to actions involving breach of fiduciary responsibility as well as exclusive jurisdiction over other actions to enforce or clarify benefit rights provided under title I. However, with respect to suits to enforce benefit rights under the plan or to recover benefits under the plan which do not involve application of the title I provisions, they may be brought not only in U.S. district courts but also in State courts of competent jurisdiction." (1974 Conf. Rep., *supra*, 1974 U.S. Code Cong. & Admin. News at p. 5107.) The Plan observes that section 1056, the part of ERISA in which REA placed the QDRO provisions, is in title I of ERISA;[5] determining whether an order is a QDRO, therefore, requires a court to apply and interpret the provisions of title I. The 1974 Conference Report, the Plan argues, shows Congress intended to reserve such interpretive authority to the federal courts.

In *Levingston II*, the federal district court agreed with the *Levingston I* court that the state courts had jurisdiction to determine the disputed order in that case was a QDRO. The *Levingston II* court considered the 1974 Conference Report and found it "interesting," but "not dispositive." (*Levingston II, supra*, 816 F.Supp. at p. 1499.) "First, the Conference Report pre-dates the enactment of the QDRO-related provisions by ten years. *See . . . Hadden* v. *Bowen*, 851 F.2d 1266, 1268 (10th Cir. 1988) (little weight given to legislative history 'that is not contemporaneous with the language' at issue). Simply because Congress implemented the QDRO provisions by creating an amendment to § 1056 does not mean that Congress intended QDRO related issues to be treated in the same manner as other title I provisions for jurisdictional purposes. . . . [¶] Moreover, the Conference Report does not mesh with the plain language of § 1132(a)(1)(B). § 1132(e)(1) provides concurrent jurisdiction for all actions under that section, and nothing in § 1132(a)(1)(B) limits its scope to actions which do not require the application of title I provisions. By its own terms, § 1132(a)(1)(B) broadly covers any action to recover, enforce, or clarify benefits, without regard to which ERISA provisions must be applied during the action." (*Levingston II, supra*, 816 F.Supp. at pp. 1499-1500.)

We find the analysis in *Levingston II* persuasive. Despite the 1974 Conference Report, Congress did not in ERISA limit state court jurisdiction to actions in which the provisions of title I of ERISA have no application. Instead, Congress extended concurrent state jurisdiction to any action by a

---

[5]Title I of ERISA was codified to subchapter I of chapter 18 of title 29 of the United States Code. (See 29 U.S.C.A. (1985) § 1002, Historical Note, References in Text, p. 71.)

participant or beneficiary to obtain or clarify benefits under the terms of a plan. As we have already seen, an action to qualify a domestic relations order and obtain benefits pursuant to it is an action to obtain or clarify benefits claimed under the terms of a plan. While Congress clearly intended that actions to enforce rights *created* by ERISA's title I would be limited to federal courts, rights to benefits awarded in a QDRO are not derived from ERISA, but from state law and plan terms.

ERISA title I, sections 1001 through 1145, contain most of the law's substantive provisions protecting employee retirement benefits. These include duties of reporting and disclosure placed on plan administrators (§§ 1021-1031), minimum standards of participation, vesting and funding for plans (§§ 1051-1086), and the duties of plan fiduciaries (§§ 1101-1114). Under section 1132(e)(1), jurisdiction to enforce these provisions or impose liability for their violation is exclusively federal. For example, jurisdiction is exclusively federal in an action against a plan administrator for failure to furnish certain information to a participant as required by section 1024 (*Duffy* v. *Brannen* (1987) 148 Vt. 75 [529 A.2d 643, 649]) and in an action against an employer alleging termination for the purpose of interfering with benefits, in violation of section 1140 (*Summers* v. *U.S. Tobacco Co.* (1991) 214 Ill.App.3d 878 [158 Ill.Dec. 412, 574 N.E.2d 206, 210-211]).[6] Again, however, Mary does not seek to enforce any such ERISA title I provisions against the Plan; she seeks payment of benefits assertedly due her under the Plan and the superior court's division of marital property. A provision of ERISA, section 1056(d)(3)(A), assertedly *permits* the Plan to pay her such benefits, but is not itself the source of Mary's rights, if any, to such benefits.

Determination of Mary's right to benefits, it is true, requires interpretation of ERISA's QDRO provisions, because those provisions limit the benefits the Plan may pay Mary under a state court order. In that sense, Mary's right to benefits could be said to depend on three sources: the terms of the Plan, the terms of the superior court order, and the terms of ERISA. But the terms of ERISA come into play only as *limits* on Mary's rights, not as their source. Mary's claim for benefits, therefore, is not an action to enforce ERISA under section 1132(a)(3).

The Plan further argues exclusive federal jurisdiction is necessary to allow development of a consistent "federal common law of rights and obligations

---

[6]Jurisdiction is also exclusively federal when the action is brought by someone other than a participant or beneficiary, because section 1132(a)(1)(B) refers only to such plaintiffs. That is the holding—irrelevant here—of two decisions cited by DOL as supporting its jurisdictional contention. (*Copeland* v. *Slidel Memorial Hosp.* (La. 1995) 657 So.2d 1292, 1301-1302; *Funk Mfg. Co.* v. *Franklin* (1996) 261 Kan. 91 [927 P.2d 944, 947-948].)

under ERISA-regulated plans" (*Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 56 [107 S.Ct. 1549, 1558, 95 L.Ed.2d 39]), as Congress intended. We disagree. ■ "Congress's choice to vest jurisdiction over one class of ERISA civil actions in both the state and federal courts is in no way inconsistent with its intent to create a comprehensive scheme of federal common law in the area. State as well as federal courts may be expositors of federal law." (*Menhorn* v. *Firestone Tire & Rubber Co.* (9th Cir. 1983) 738 F.2d 1496, 1500, fn. 2.) Although Congress may have expected that state courts typically would resolve section 1132(a)(1)(B) actions through application of "general principles of contract law" (738 F.2d at p. 1500, fn. 2), the rule of federal exclusivity cannot be so broad as to exclude *all* state court participation in the development of ERISA law. Every action brought by a participant or beneficiary under section 1132(a)(1)(B), even if it purports to state causes of action under state law, is deemed to arise under, and to be governed solely by, federal law, i.e., ERISA and its common law outgrowths (*Metropolitan Life Ins. Co.* v. *Taylor* (1987) 481 U.S. 58, 62-66 [107 S.Ct. 1542, 1545-1548, 95 L.Ed.2d 55]), yet Congress expressly permitted such actions to be brought in state court.

■ Finally, whatever inferences may be drawn from the 1974 legislative history, we agree with both *Levingston* courts that Congress, when it amended ERISA through REA in 1984, did not intend to strip state courts of the power to enforce QDRO's against plan administrators. (See *Levingston I, supra,* 12 Cal.App.4th at pp. 1306-1307; *Levingston II, supra,* 816 F.Supp. at p. 1500.) Even before the passage of REA, an action by a beneficiary to obtain benefits awarded in a state domestic relations order was held to come within section 1132(a)(1)(B), giving concurrent jurisdiction to state and federal courts. (*Stone* v. *Stone* (9th Cir. 1980) 632 F.2d 740, 742-743; *General Dynamics Corp.* v. *Harris* (Tex.Ct.App. 1979) 581 S.W.2d 300, 303-304; *In re Marriage of Pilatti* (1979) 96 Cal.App.3d 63, 65-68 [157 Cal.Rptr. 594].) REA, of course, confirmed that a state court's division of retirement benefits and assignment of such benefits to a former spouse or dependent was not preempted or precluded by ERISA. It seems highly unlikely Congress, acting to protect the rights of former spouses and dependents as adjudicated in state court, would, at the same time, have deprived them of their existing ability to obtain enforcement of those rights in state court and required them instead to initiate a separate lawsuit in federal court whenever a retirement plan disputed the qualified status of the state court order.

Because federal courts cannot themselves issue or modify domestic relations orders (see, e.g., *Hunter* v. *Ameritech* (N.D.Ill. 1991) 779 F.Supp. 419,

421; *Dickerson* v. *Dickerson* (E.D.Tenn. 1992) 803 F.Supp. 127, 134), separate litigation of the QDRO issue in federal court presents the potential for an expensive and time-consuming course of parallel litigation, including possible appeals, in the two court systems. Few of the former spouses and dependents whose interests REA was intended to protect could afford such expense or delay in determination of their income. Indeed, as the principal House sponsor of REA explained, the legislation was intended to clarify the law in the hope of *reducing* the need for extended litigation, for "no one benefits when a participant's or beneficiary's rights or a plan's obligations are so unclear that costly and protracted litigation is the inevitable result of lack of statutory clarity." (Remarks of Rep. Clay, Debate on H.R. 4280, 98th Cong., 2d Sess. (1984) reprinted in ERISA: Selected Legislative History 1974-1985 (Bur. Nat. Affairs 1986) p. 252 (hereafter BNA Legislative History).) In the absence of explicit direction in the law, we will not presume Congress intended to deprive alternate payees of their remedy in state court.

At oral argument, counsel for DOL suggested that were we to hold Mary's action comes under section 1132(a)(1)(B), allowing concurrent jurisdiction, we would actually make it harder for other similarly situated alternate payees to obtain disputed benefits. That result would follow, according to DOL, because, under *Firestone Tire & Rubber Co.* v. *Bruch* (1989) 489 U.S. 101 [109 S.Ct. 948, 103 L.Ed.2d 80] (*Firestone*), courts in section 1132(a)(1)(B) actions must apply a deferential standard of review to plan administrators' decisions. Even if relevant to the jurisdictional question, which we doubt, DOL's argument that state courts would have limited authority to review decisions of plan administrators is not well taken. *Firestone* actually holds that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." (*Firestone, supra*, 489 U.S. at p. 115 [109 S.Ct. at pp. 956-957].) Although the Plan does give Hughes the authority to interpret the Plan's terms, it gives Hughes no discretionary authority to determine whether a state court order is a QDRO as defined in ERISA or as defined in the Plan (which merely incorporates ERISA's definition). The determination that an order is not a QDRO is therefore, under *Firestone*, reviewed de novo.

For the reasons given, we conclude state courts have subject matter jurisdiction, concurrent with that of the federal courts, over whether a domestic relations order is a QDRO as defined in ERISA, section

1056(d)(3)(B). The Court of Appeal therefore did not err by deciding that substantive question.[7]

## II. *Payment of Benefits Under the Rule of 75*

■ Under California law, a nonemployee spouse may be entitled to begin receiving his or her community interest in an employee spouse's retirement benefits prior to the employee spouse's actual retirement. (*In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 422-429 [174 Cal.Rptr. 493, 629 P.2d 1].)[8] In the 1984 REA amendments to ERISA, Congress recognized that state domestic relations orders might call for such preretirement payments to an alternate payee. REA provides that an order may be a QDRO even if it requires preretirement payment on or after the participant's earliest retirement age and "as if the participant had retired on the date on which such payment is to begin under such order (*but taking into account only the present value of benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement*)." (§ 1056(d)(3)(E)(i)(II), italics added.)[9]

---

[7]DOL urges us to hold that, even if state courts have jurisdiction, the California statutory provisions for joining retirement plans as parties in dissolution actions are invalid because they are preempted by ERISA; any state court action to determine QDRO status, DOL argues, would have to be separate from the marital dissolution action. We do not ordinarily consider questions not raised by the appellate record and put forward only by an amicus curiae (*E.L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 510-511 [146 Cal.Rptr. 614, 579 P.2d 505]), and we see no reason to depart from that policy here. The Plan has never objected to participating in the dissolution action and has refrained from claiming ERISA preemption of California joinder statutes even after DOL put this theory forward in the Court of Appeal. DOL's theory has, as well, been previously rejected by California courts. (*In re Marriage of Baker, supra,* 204 Cal.App.3d at pp. 218-219; *In re Marriage of Campa* (1979) 89 Cal.App.3d 113, 120-131 [152 Cal.Rptr. 362].)

[8]*In re Marriage of Gillmore* did not, however, hold the nonemployee spouse is entitled to receive benefits directly from the retirement plan, rather than from the employee spouse. Family Code section 2610, subdivision (b)(2), prohibits the court dividing community property from ordering preretirement payment of benefits by a plan, unless the plan provides for such benefits or such benefits are provided for in certain California statutes regarding public employee retirement benefits, or in "similar enactments." (See generally, 2 Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1997) ¶¶ 8:1235 to 8:1236, pp. 8-299.1 to 8.299.2.) In the present case the Plan, by its terms, allows the payment of benefits to a nonparticipant pursuant to a QDRO; the summary plan description provided to participants, moreover, explains that such payment could begin "as early as your attainment of age 55 even if you are still employed and contributing to the Plan." We do not decide whether Mary would be entitled, under *Gillmore* (and ERISA), to receive from James the unreduced early retirement benefits we will hold the Plan may not pay under ERISA.

[9]More fully, section 1056(d)(3) provides: "(B) For purposes of this paragraph— [¶] (i) the term 'qualified domestic relations order' means a domestic relations order— [¶] . . . [¶] (II) with respect to which the requirements of subparagraphs (C) and (D) are met . . . [¶] . . . [¶] (D) A domestic relations order meets the requirements of this subparagraph only if such

█ The parties agree, as did the Court of Appeal, that resolution of this case requires us to interpret the above italicized proviso in section 1056(d)(3)(E)(i)(II). They differ, however, as to its meaning and application. The Plan contends the Rule of 75 benefits are an "employer subsidy for early retirement," which may not be paid to an alternate payee before the participant's actual retirement; the "present value of benefits actually accrued," the Plan maintains, was properly calculated by determining the actuarial equivalent of James's normal retirement age (age 65) periodic benefit. Mary maintains, to the contrary, that Rule of 75 benefits are not an "employer subsidy for early retirement" within the meaning of the statute, but are normal retirement benefits accrued under the plan by participants. We conclude the Plan is correct.

First, section 1056(d)(3)(E)(i)(II) limits benefits payable under preretirement QDRO's to "the present value of benefits actually accrued." A participant's "accrued benefit" is defined as an annual benefit commencing at normal retirement age, or as the "actuarial equivalent" of such a benefit. (§§ 1002(23), 1054(c)(3).) Section 1056(d)(3)(E)(i)(II), therefore, mandates that early retirement benefits paid pursuant to a preretirement QDRO be based on the actuarial value of the participant's normal retirement age benefit; any greater early retirement benefit represents an increase over "the present value of benefits actually accrued." The Plan was therefore not permitted, under ERISA, to pay Mary a portion of James's benefits before James's retirement without reducing those benefits to the actuarial equivalent of James's age-65 benefit. Unreduced benefits provided by the Rule of 75 could not be paid before James's retirement.

The same conclusion follows if one focuses, as have the parties and the Court of Appeal, on the meaning of "employer subsidy" in section 1056(d)(3)(E)(i)(II). ERISA itself does not define "employer subsidy." The term "subsidy," however, is used in a related context elsewhere in the REA amendments: section 1054(g)(2) prohibits amendment of a plan to eliminate an early retirement benefit or "retirement-type subsidy." The 1984 Senate Report, explaining this provision, parenthetically defined a subsidy as "the excess of the value of a benefit over the actuarial equivalent of the normal

---

order— [¶] (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan . . . . [¶] . . . [¶] (E)(i) A domestic relations order shall not be treated as failing to meet the requirements of clause (i) of subparagraph (D) solely because such order requires that payment of benefits be made to an alternate payee— [¶] (I) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age, [and] [¶] (II) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement) . . . ."

retirement benefit." (1984 Sen. Rep., *supra*, 1984 U.S. Code Cong. & Admin. News at p. 2574.) Both parties, the Court of Appeal and amicus curiae California Employment Law Council all embrace this definition of subsidy for the present purpose. We agree this is the probable meaning of subsidy in section 1056(d)(3)(E)(i)(II); the "actuarial equivalent" criterion is also suggested by the command of section 1056(d)(3)(D)(ii) that a QDRO not "require the plan to provide increased benefits (determined on the basis of actuarial value)." (Accord, 2 Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:1194, p. 8-286.) Whether Rule of 75 benefits are subsidized, therefore, depends on whether their value is greater than the actuarial value of a participant's normal retirement benefit.

"Normal retirement benefit" is defined in ERISA as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." (§ 1002(22).)[10] James's periodic early retirement benefit under the Plan's Rule of 75 would be the *same as*, but not *greater than*, his periodic payment if he retired at age 65. Under the quoted definition, consequently, James's normal retirement benefit is simply his normal retirement age benefit, that is, the periodic amount he would receive if he were to retire from Hughes at age 65.

Applying, next, the definition of a subsidy as "the excess of the value of a benefit over the actuarial equivalent of the normal retirement benefit" (1984 Sen. Rep., *supra*, 1984 U.S. Cong. & Admin. News at p. 2574), one readily sees that the Rule of 75 benefits are a subsidy. Although the periodic payments available under the Rule of 75 are the same as the age-65 benefit, the *value* of the Rule of 75 benefit is much greater than the actuarial equivalent of the age-65 benefit. Because the unreduced early retirement annuity available under the Rule of 75 would begin sooner and could be expected on the basis of mortality statistics to be paid for a longer time, its value would exceed the actuarial equivalent of the same annuity commencing when James reaches age 65. The excess value is an early retirement subsidy.

The Court of Appeal, applying the same definitions, nonetheless concluded the Rule of 75 benefits were *not* subsidized. The court's conclusion rested on its belief the "early retirement benefit" referred to in section 1002(22) is the plan's early retirement benefit "actuarially increased for

[10]ERISA requires that plans provide an employee's right to the "normal retirement benefit" is "nonforfeitable upon the attainment of normal retirement age." (§ 1053(a); 26 U.S.C. § 411(a).) A nonforfeitable right to benefits is an "unconditional" and "legally enforceable" claim against the plan. (§ 1002(19).) In other words, an employee must be "100 percent vested in his accrued benefit when he attains the normal or stated retirement age." (1974 Conf. Rep., *supra*, 1974 U.S. Code Cong. & Admin. News at p. 5050.)

deferment to normal retirement age." Mary adopts the same reasoning, asserting that the law requires "an actuarial increase to defer the [early retirement benefit] to the [normal retirement age benefit] form, and payable from age 65." Because section 1002(22) "define[s] the [normal retirement benefit] as the *greater* of the Plan's [early retirement benefit] and its [normal retirement age benefit]," Mary argues, "the [early retirement benefit] can *never* be worth more than the [normal retirement benefit]."

The Plan argues persuasively that the Court of Appeal's analysis is circular and would render meaningless Congress's distinction between subsidized and unsubsidized early retirement benefits. If the periodic early retirement benefit used to determine the normal retirement benefit under section 1002(22) were first increased, so that it would have the same actuarial value beginning at age 65 as at early retirement, then, as Mary's own argument reveals, the actuarial value of the Plan's normal retirement benefit would *always*, by definition, be at least as great as the value of the plan's early retirement benefit. Under that analysis, *no* early retirement benefit could be considered subsidized. Section 1056(d)(3)(E)(i)(II)'s reference to employer subsidization of early retirement would be rendered meaningless.

We agree with the Plan that Mary and the Court of Appeal misunderstand section 1002(22). The early retirement and normal retirement age benefits referred to there are *periodic* benefits, without any actuarial adjustment. Section 1022(22) simply ensures that the periodic payments of a participant's normal retirement benefit under a plan will be no smaller than the payments available under the plan's early retirement option, if any. The normal retirement benefit defined in section 1002(22), in other words, does *not* include the increased *value* of unreduced early retirement payments. Because unreduced early retirement benefits, such as those available under the Rule of 75, have a *value* greater than the actuarial equivalent of a plan's normal retirement benefit, they include a subsidy as defined in the 1984 Senate Report.

This understanding of "normal retirement benefit" as used in ERISA is confirmed in a Treasury Department regulation implementing a tax provision of ERISA (26 U.S.C. § 411). That regulation defines "normal retirement benefit" as "the *periodic* benefit under the plan commencing upon early retirement (if any) or at normal retirement age, whichever benefit is greater." (26 C.F.R. § 1.411(a)-7(c)(1) (1996), italics added.) An example provided in the Treasury Department regulation, moreover, answers negatively the precise question before us, i.e., whether a plan's "normal retirement benefit" includes the added actuarial value of an unreduced early retirement benefit:

"*Example (1)*. Plan A provides for a benefit equal to 1% of high 5 years compensation for each year of service and a normal retirement age of 65. The plan also provides for a full unreduced accrued benefit without any actuarial reduction for any employee at age 55 with 30 years of service. Even though the actuarial value of the early retirement benefit could exceed the value of the benefit at the normal retirement age, the normal retirement benefit would not include the greater value of the early retirement benefit because actuarial subsidies are ignored." (26 C.F.R. § 1.411(a)-7(c)(6) (1996).)[11]

The above understanding of "normal retirement benefit" is also reflected in the terms of the Plan itself. Section 4.2(c) of the Plan provides that the "monthly Benefit" constituting a participant's "Normal Retirement Benefit" shall not be less than the "largest monthly Benefit" the participant could have received as an early retirement benefit (Plan, §§ 4.8(a), 4.8(c)) or vested retirement benefit (*id.*, § 4.15). Section 4.8(c) of the Plan describes the unreduced "monthly payment" available under the Rule of 75. As under the general definition in section 1002(22), therefore, the "normal retirement benefit" under the Plan is a *periodic* payment defined as the largest of several possible *periodic* amounts. The periodic amount of the normal retirement benefit may be equal to the Rule of 75 periodic payment, but it does not include the additional actuarial value of the longer *stream* of Rule of 75 payments that commence before normal retirement age. Again, the excess value of that stream of payments over the actuarial value of the normal retirement benefit is a subsidy, which under section 1056(d)(3)(E)(i)(II) may not be included in a QDRO when the participant has not actually retired.

Our reading of section 1056(d)(3)(E)(i)(II) is further supported by legislative history directly concerning that subsection. The 1984 Senate Report explains the subsection as follows: "When payments are made to an alternate payee before the participant retires, the payments are computed by taking into account only benefits actually accrued and not taking into account any employer subsidy for early retirement. The amount to be paid to the alternate payee is to be calculated by using the participant's normal retirement benefit

---

[11]Mary, like the Court of Appeal, relies on another paragraph of the Treasury regulation as supporting her position. Paragraph (c)(2)(ii) provides that if the early retirement annuity is not payable in the same "form" as the annuity payable on retirement at normal retirement age, the former must be converted to the same "form of annuity benefit" as the latter before determining which of the two is greater and therefore which is the normal retirement benefit. (26 C.F.R. § 1.411(a)-7(c)(2)(ii) (1996).) Contrary to the position of Mary and the Court of Appeal, that paragraph does not require any actuarial increase in the early retirement benefit to account for its hypothetical deferral to normal retirement age; a difference in *commencement time* of annuity payments is not a difference in the *form* of annuity.

accrued as of the date payout begins and by *actuarially reducing such benefit* based on the interest rate specified in the plan or 5 percent, if the plan does not specify an interest rate."[12] (1984 Sen. Rep., *supra*, 1984 Code Cong. & Admin. News at p. 2567, italics added; see also BNA Legislative History, *supra*, at pp. 250-251 [remarks of Rep. Clay, explaining operation of QDRO provisions through examples: where plan provides a "supplement" for retirement between ages of 55 and 62, former spouse may elect to begin receiving benefits when participant reaches age 55, but may not receive supplement if participant does not retire before age 62].) Under Mary's approach, she could receive periodic payments based on the normal periodic retirement benefit, without any actuarial reduction in amount to account for the earlier commencement and the longer stream of payments, despite the fact James continued to work for Hughes. The legislative history confirms that Congress did not intend a QDRO to increase a plan's obligations in this manner.

Finally, the Plan's understanding of its Rule of 75 benefits as an employer subsidy for early retirement is supported by the common understanding among courts and commentators as to the subsidized character of unreduced early retirement benefits. For example, the United States Supreme Court, in a decision concerning a plan's ERISA obligations upon plan termination, described the plan's early retirement benefits as follows: "At age 55, participants were eligible for early retirement benefits, calculated in the same manner as normal retirement benefits, but reduced by five percent for each year by which a participant's retirement preceded the normal retirement age. [Citations.] *A subsidized or unreduced early retirement benefit, i.e.*, a benefit equal to that payable at age 65, was available to participants who had 30 or more years of service and elected to retire after age 62." (*Mead Corp.* v. *Tilley* (1989) 490 U.S. 714, 719 [109 S.Ct. 2156, 2160, 104 L.Ed.2d 796], italics added.) Another federal decision recently described a bank's early retirement benefits as including, for qualifying participants, " 'unreduced early retirement benefits.' These benefits included a *subsidy* from the Bank so that from the date of early retirement a retiree would receive benefit payments equivalent to those he would have received had he postponed retirement until age sixty-five." (*Hein* v. *F.D.I.C.* (3d Cir. 1996) 88 F.3d 210, 213, italics added; see also, *Larson* v. *Northrop Corp.* (D.C. Cir. 1994) 21 F.3d 1164, 1166, fn. 2 [305 App.D.C. 416] ["An early retirement subsidy 'is the excess of the value of the early retirement benefit over the actuarial equivalent of the accrued benefit payable at the normal retirement age.' "].)

Commentators have similarly characterized unreduced early retirement benefits as subsidized. A practitioners' guidebook on QDRO's explains the

---

[12]Section 1.6 of the Plan specifies the interest and mortality rates to be used in making such actuarial reductions.

term "early retirement subsidy" by noting that early retirement benefits are usually reduced "to reflect the fact that the payments will be paid for many additional years. An early retirement subsidy exists if a participant retires before the normal retirement age and receives a retirement benefit that has not been actuarially reduced." (Meyen & Dundee, Qualified Domestic Relations Order Answer Book (1996) Q1:61, p. 1-45.) A California family law treatise explains that when the participant has not retired, the former spouse's benefit under a QDRO is limited to the actuarial value of normal retirement benefits: "This may be *much less* than the amount which would have been paid if the employee actually had retired early (because early retirement is often subsidized by the employer)." (2 Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:1194, p. 8-286.) We agree with these courts and commentators that unreduced early retirement benefits are an employer subsidy that, under section 1056(d)(3)(E)(i)(II), may not be ordered paid under a QDRO while the participant continues to work for the plan sponsor.

As reflected in the above comments, employers not infrequently subsidize employees' early retirement as an incentive for specified groups of employees to leave the employer's work force voluntarily, so as to reduce its wage burden or "avoid litigation that might result from laying off an employee." (*Lockheed Corp.* v. *Spink* (1996) 517 U.S. 882, 894 [116 S.Ct. 1783, 1791, 135 L.Ed.2d 153, 166].) Such subsidized early retirement programs are a "*quid pro quo* between the plan sponsor and the participant." (*Id.* at p. 894 [116 S.Ct. at p. 1791, 135 L.Ed.2d at p. 165].) Mary, however, seeks to make Hughes pay the quid without getting the quo. As sponsor of the Plan, Hughes would remain responsible for funding the portion of James's Rule of 75 benefits paid to Mary, while James continued to work and receive salary and other benefits from Hughes. Section 1056(d)(3)(E)(i)(II) appears designed to avoid just such a result.

Nothing we say here, we note, precludes recalculation of Mary's payments if James actually takes early retirement. Upon the participant's retirement with subsidized early retirement benefits, ERISA does not prohibit modification of a previous order "so that the alternate payee also receives a share of the subsidized benefit." (1984 Sen. Rep., *supra*, p. 21, 1984 U.S. Code Cong. & Admin. News at p. 2567.) The Plan concedes the superior court retains jurisdiction to modify its QDRO, and expressly waives any objection to such a recalculation upon James's early retirement.

### DISPOSITION

We conclude the Court of Appeal erred in directing the superior court to order the Plan to pay Mary benefits calculated under the Rule of 75. The judgment of the Court of Appeal is reversed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied October 15, 1997.