[No. D021205. Fourth Dist., Div. One. Sept. 15, 1998.]

In re the Marriage of JANET D. and GENE T. SHELSTEAD.
JANET D. SHELSTEAD, Respondent, v.
GENE T. SHELSTEAD, Respondent;
CARPENTERS PENSION TRUST FOR SOUTHERN CALIFORNIA,
Appellant.

## COUNSEL

DeCarlo, Connor & Selvo, Margaret R. Gifford and Desmond C. Lee for Appellant.

Stanton, Kay & Watson, James P. Watson, Bruce K. Leigh, Van Bourg, Weinberg, Roger & Rosenfeld, Gibbs, Giden, Locher & Acret and John H. Stephens as Amici Curiae on behalf of Appellant.

No appearance for Respondent Wife.

No appearance for Respondent Husband.

Michael C. Shea, E. Stephen Temko, Kim W. Cheatum, Frances L. Harrison, Karen L. Handorf, Paula J. Page, Barbara A. Matthews and Paul C. Adair as Amici Curiae.

## OPINION

**HALLER, J.**—In *Boggs* v. *Boggs* (1997) 520 U.S. 833 [117 S.Ct. 1754, 138 L.Ed.2d 45], the United States Supreme Court held ERISA[1] preempts state law allowing a nonemployee spouse to transfer *by testamentary instrument* an interest in undistributed pension plan benefits. In this case, we consider the related question whether a state court *in a dissolution action* may properly enter a domestic relations order providing the nonemployee spouse with the right to name a successor in interest to receive her share of undistributed

---

[1]The Employee Retirement Income Security Act of 1974. (See 29 U.S.C. § 1001 et seq.) All further statutory references are to this title unless otherwise specified.

community property pension benefits upon her death. We hold the order in question is not a qualified domestic relations order (QDRO) and therefore it is an invalid alienation of pension benefits under ERISA. Specifically, we conclude the order is not a QDRO because a successor in interest is not an "alternate payee" within the meaning of ERISA. Accordingly, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

Janet D. and Gene T. Shelstead married on June 16, 1973. During the marriage, Gene earned pension credits and became a vested participant in Carpenters Pension Trust for Southern California (CPT), a multiemployer trust fund governed by ERISA. Upon retirement and completion of the eligibility conditions, Gene will be entitled to an annuity for his life and for the life of a surviving spouse.[2]

On November 17, 1992, Janet and Gene separated. During the subsequent marital dissolution action, the parties joined CPT as a party. The court entered a judgment of dissolution on August 30, 1993. At the time, Gene had not yet retired. The judgment awarded Janet one-half interest in the community portion of Gene's pension benefits with CPT. The court determined the community property benefit reflected Gene's employment from January 16, 1973, through November 17, 1992.

On February 1, 1994, the court signed a document entitled "Qualified Domestic Relations Order." Paragraph 3 of the order stated the parties agreed that each would receive 50 percent of the community portion of Gene's CPT pension benefits. Paragraph 5 stated: "Commencing with the effective date of [Gene's] pension benefit, [CPT] shall pay to [Gene] each month, the balance of [Gene's] pension benefit remaining after deducting therefrom the amount payable to [Janet]. At the same time, [CPT] shall pay to [Janet] each month [Janet's] share of pension benefit. *The share payable to [Janet] shall continue to be paid to [Janet], or her designated successor in interest should [Janet] predecease [Gene], until terminated by [Gene's] death.* [CPT] shall not be liable to [Gene] for any payments made to [Janet] before [CPT] receives written notice of [Janet's] death." (Italics added.)

---

[2]If Gene is unmarried when he retires or obtains the prior written consent of his surviving spouse, he may be entitled to select an alternative plan providing an annuity for his own life and for the life of a third party. (See § 1055(c)(2).)

After Janet served the order on CPT, CPT advised Janet that the order was not a QDRO since it required CPT to pay Janet's designated successor if she predeceased Gene. (See § 1056(d)(3)(G)(i)(II).)[3]

Janet petitioned for an order to show cause, asking the superior court to order CPT to comply with the February 1 order. After a hearing, the court found the February 1 order was a QDRO and that the order "[did] not impose an excessive burden on [CPT]." The court awarded attorney fees of $2,000 against CPT.

CPT appealed, asserting the trial court erred in determining the February 1 order was a QDRO and in awarding attorney fees to Janet. CPT contended the court order was not a QDRO because (1) the provision permitting Janet to name a successor in interest to receive her share of the pension benefits provides a type or form of benefit not provided in CPT's plan (§ 1056(d)(3)(D)(i)); and (2) Janet's successor in interest is not an "alternate payee" within the meaning of ERISA (§ 1056(d)(3)(K)). Janet did not file a respondent's brief.

Because the issues raised by CPT were of first impression, we invited amicus curiae briefs from several family law and appellate organizations. The San Diego County Certified Family Law Specialists[4] (Family Law Specialists) responded and filed an amicus curiae brief supporting Janet's position below that the February 1 order is a QDRO. Two other organizations filed amicus curiae briefs: the United States Department of Labor (DOL) and an organization of pension funds (Pension Funds).[5]

In our previous opinion, we rejected CPT's arguments, but determined the court order was not a QDRO to the extent it did not identify the name or address of Janet's successor in interest or the mechanism for determining an alternate successor. We reversed and remanded.

The California Supreme Court granted CPT's petition for review, and later retransferred the case to this court with directions to vacate our opinion and reconsider in light of *Boggs* v. *Boggs, supra,* 520 U.S. 833 [117 S.Ct. 1754],

---

[3]Section 1056(d)(3)(G)(i)(II) provides "within a reasonable period after receipt of [a domestic relations order concerning transfer of pension benefits], [an ERISA] plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination."

[4]The San Diego County Certified Family Law Specialists is a countywide association of attorneys who have been certified by the California State Bar as specialists in family law.

[5]The Pension Funds maintained the February 1 order is not a QDRO. The DOL expressed its opinion that CPT's plan administrator should have qualified the February 1 order as a QDRO, but urged us to dismiss the appeal because the trial court had no jurisdiction over the matter.

a decision filed after our original opinion. CPT submitted supplemental briefs, as did amici curiae DOL, Pension Funds, Family Law Specialists, and Cement Masons Southern California Pension Trust.

After our Supreme Court retransferred this matter and before the parties had completed their briefing, Janet died. This unfortunate event does not render the matter moot. CPT is bound by the February 1 order in determining the appropriate parties to receive pension payments upon Gene's retirement unless the order is reversed or modified on appeal. This viable issue requires resolution.

DISCUSSION

### I. *The February 1 Order*

■ CPT does not dispute the February 1 order is proper under California community property law. (See Fam. Code, § 2610; *In re Marriage of Powers* (1990) 218 Cal.App.3d 626, 634-646 [267 Cal.Rptr. 350]; *In re Marriage of Taylor* (1987) 189 Cal.App.3d 435, 440-443 [234 Cal.Rptr. 486]; *In re Marriage of Nice* (1991) 230 Cal.App.3d 444, 450-453 [281 Cal.Rptr. 415].) CPT argues instead the order is prohibited by federal law (ERISA) and this federal law preempts California community property law. In considering this contention, we first discuss ERISA's preemption and antialienation provisions. We next discuss the United States Supreme Court's recent decision in *Boggs* v. *Boggs, supra,* 520 U.S. 833 [117 S.Ct. 1754]. We then describe ERISA's QDRO provisions and explain our conclusion the February 1 order is invalid because it does not meet the requirements of a QDRO.

### A. *ERISA's Preemption and Antialienation Provisions*

■ ERISA is a comprehensive federal statutory scheme designed to protect the interests of employees and their beneficiaries in employee benefit plans. (*Boggs* v. *Boggs, supra,* 520 U.S. at p. 845 [117 S.Ct. at p. 1762]; *Burch* v. *George* (1994) 7 Cal.4th 246, 288 [27 Cal.Rptr.2d 165, 866 P.2d 92].) ERISA contains a broad preemption clause, providing that ERISA provisions preempt any state law relating to an employee benefit plan. (§ 1144(a).) ERISA also contains an anti-alienation or spendthrift provision, stating "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." (§ 1056(d)(1).) Congress included the spendthrift provision to protect employees and their dependents from the participant's financial improvidence and to ensure benefits were available upon retirement. (See *Guidry* v. *Sheet Metal Workers Pension Fund* (1990) 493 U.S. 365, 376 [110 S.Ct. 680, 687, 107 L.Ed.2d 782].)

Shortly after ERISA's enactment, courts began grappling with the question whether the transfer of pension benefits incident to a divorce was a prohibited assignment or alienation. Although most courts held the alienation provision was not applicable to transfers or allocations between an employee and his or her former spouse (see, e.g., *In re Marriage of Campa* (1979) 89 Cal.App.3d 113, 121-131 [152 Cal.Rptr. 362]; *American Tel. & Tel. Co.* v. *Merry* (2d Cir. 1979) 592 F.2d 118, 120-125), some courts held ERISA preempted the application of state community property law with respect to interspousal transfers. (See *Francis* v. *United Technologies Corp.* (N.D.Cal. 1978) 458 F.Supp. 84, 86.)

Seeking to address this and other issues, Congress enacted an amendment to ERISA, known as the Retirement Equity Act of 1984 (REA). (*Mackey* v. *Lanier Collection Agency & Serv.* (1988) 486 U.S. 825, 838 [108 S.Ct. 2182, 2190, 100 L.Ed.2d 836]; see *Ablamis* v. *Roper* (9th Cir. 1991) 937 F.2d 1450, 1453 (*Ablamis*); *In re Marriage of Oddino* (1997) 16 Cal.4th 67, 75 [65 Cal.Rptr.2d 566, 939 P.2d 1266].) Congress "sought to protect the rights of nonemployee spouses and dependents by allowing state courts to make equitable divisions of property in a divorce or dissolution and provision for support of dependents." (*In re Marriage of Oddino, supra,* 16 Cal.4th at p. 75; see *In re Marriage of Baker* (1988) 204 Cal.App.3d 206, 216-217 [251 Cal.Rptr. 126]; Summers, *ERISA Preemption of "Direct" and "Indirect" Community Property Interests in Pension Plans Upon the Non-Participant Spouse's Death* (1994) 55 La. L.Rev. 409, 423-425.)

Although it could have done so, Congress did not attempt to achieve this objective by broadly permitting all interspousal transfers of pension benefits upon divorce. Instead, Congress took a two-step approach. First, it declared the transfers of pension benefits between spouses in a divorce context *were* prohibited alienations within the meaning of the anti-alienation provision. (§ 1056(d)(1) & (d)(3)(A).)[6] Second, Congress created a limited exception to the rule, providing the anti-alienation provision "shall not apply if the order is determined to be a qualified domestic relations order [QDRO]." (§ 1056(d)(3)(A).) Consistent with this language, Congress added an exception to the express ERISA preemption provision, stating the preemption provision "shall not apply to [QDRO's]." (§ 1144(b)(7).)

These amendments provide that a domestic relations order that attempts to transfer pension benefits away from the employee is specifically barred by the spendthrift clause unless the order satisfies the QDRO criteria. (See *In re*

---

[6]Section 1056(d)(3)(A) provides the anti-alienation provision "*shall* apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order . . . ." (Italics added.)

*Marriage of Oddino, supra,* 16 Cal.4th at p. 77; *In re Marriage of Baker, supra,* 204 Cal.App.3d at p. 219; *Fox Valley & Vic. Const. Wkrs. Pension F. v. Brown* (7th Cir. 1990) 897 F.2d 275, 279.) As one commentator explains, "[b]y stating explicitly that divorce divisions of pension plans are [alienations], Congress has foreclosed community ownership of the right to receive benefits by non-participant spouses unless that right is transferred to the spouse by a QDRO." (Summers, *supra,* 55 La. L.Rev. at p. 438.)

## B. *Boggs v. Boggs*

In *Boggs,* the United States Supreme Court held ERISA preempts state law permitting a "predeceasing non-employee spouse" (*Ablamis, supra,* 937 F.2d at p. 1457) to transfer undistributed pension benefits by testamentary instrument. (*Boggs* v. *Boggs, supra,* 520 U.S. at pp. 842-854 [117 S.Ct. at pp. 1761-1767].) This holding is not dispositive here because *Boggs* did not arise in the divorce context or concern a domestic relations order and thus the court did not specifically interpret or apply the QDRO provisions. But the decision contains relevant analysis guiding our consideration of the issues raised in this case. Most significant for our purposes, the decision makes clear the fundamental importance of the statutorily defined "participant" and "beneficiary" statuses as a limitation on those entitled to receive ERISA pension benefits.

To understand *Boggs*'s applicability to the issues raised here, it is helpful to briefly summarize the facts and reasoning underlying the court's conclusions. Issac Boggs began working for his employer in 1949. Issac and his wife, Dorothy, had three sons. In 1979, Dorothy died, leaving Issac one-third of her estate and her sons the remaining two-thirds subject to Issac's life estate (called a "lifetime usufruct" under Louisiana law). In 1980, Issac married Sandra. In 1985, Issac retired, obtaining three primary benefits: (1) a lump-sum distribution from his employer's savings plan, which he rolled over into an IRA (individual retirement account); (2) shares of his employer's stock; and (3) a monthly annuity during his retirement. In 1989, Issac died.

The sons filed suit in Louisiana state court, seeking a portion of Issac's IRA, stock shares, and past monthly annuity payments, and portions of Sandra's past and future survivor annuity payments. (*Boggs* v. *Boggs, supra,* 520 U.S. at p. 837 [117 S.Ct. at p. 1759].) Sandra responded by filing a federal court complaint seeking a declaratory judgment that ERISA preempts Louisiana's community property and succession laws to the extent they recognize the sons' claim to an interest in the retirement benefits. (*Ibid.*)

After the Sixth Circuit affirmed the district court's determination that there was no preemption, the United States Supreme Court granted certiorari.[7]

Holding ERISA preempted Louisiana law permitting Dorothy to bequeath her community property pension benefits, the high court first discussed the sons' claims they were entitled to a portion of Sandra's survivor's annuity. (*Boggs* v. *Boggs, supra,* 520 U.S. at pp. 842-865 [117 S.Ct. at pp. 1761-1772].) The court detailed ERISA's provisions mandating a survivor's annuity unless waived by the surviving spouse (§ 1055) and explained the importance of the survivor's annuity to achieving ERISA's goals of ensuring a stream of income to participants and their beneficiaries. (*Ibid.*) Based on this discussion, the court concluded it would undermine congressional intent to allow Dorothy by a testamentary instrument to limit Sandra's right to the guaranteed annuity. (*Boggs* v. *Boggs, supra,* 520 U.S. at pp. 842-865 [117 S.Ct. at pp. 1761-1772].)

*Boggs* then concluded the sons could not prevail on their claims to the remaining undistributed[8] retirement benefits because they were not "participants" or "beneficiaries" under the QDRO or survivor annuity provisions. (*Boggs* v. *Boggs, supra,* 520 U.S. at pp. 845-850 [117 S.Ct. at pp. 1762-1765].) The court further determined that, as with survivors' annuities, these additional pension benefits were intended to provide a stream of income to participants and their beneficiaries and therefore it would be "inimical to ERISA's purposes to permit testamentary recipients to acquire a competing interest in undistributed pension benefits." (*Id.* at p. 852 [117 S.Ct. at p. 1766].)

In reaching these conclusions, *Boggs* implicitly approved the Ninth Circuit's decision in *Ablamis, supra,* 937 F.2d 1450. In *Ablamis,* the wife of an ERISA plan participant named her children from a former marriage as beneficiaries of a portion of her community property pension benefits. (*Id.* at p. 1452.) After the wife died, the trustee of the ERISA plan obtained a declaratory order holding that the wife's estate was not entitled to an interest in the community pension benefits. *Ablamis* affirmed, reasoning the attempted transfer was a prohibited alienation under ERISA because a transfer

---

[7]The court granted certiorari because of the "undoubted importance" of the issue and the apparent conflict between the Sixth Circuit's decision and the Ninth Circuit's decision in *Ablamis, supra,* 937 F.2d 1450, which held ERISA preempts a testamentary transfer by a nonparticipant spouse of her community property interest in undistributed pension plan benefits. (*Boggs* v. *Boggs, supra,* 520 U.S. at pp. 836, 837 [117 S.Ct. at pp. 1758, 1759].)

[8]Although Issac had received the benefits before his death, the court stated it was focusing on the sons' rights to *undistributed* pension benefits since their claims were based on Dorothy's attempted testamentary transfer before the benefits were distributed. (*Boggs* v. *Boggs, supra,* 520 U.S. at p. 845 [117 S.Ct. at p. 1762].)

of benefits in probate is not a "domestic relations" order. (*Id.* at pp. 1455-1456.) The court stressed that permitting a testamentary transfer would violate the fundamental purpose and goals of ERISA—"to ensure that both spouses would receive sufficient funds to afford them security during their lifetimes, not to arrange for an opportunity for a predeceasing non-employee spouse to leave a part of her surviving husband's pension rights to others." (*Id.* at p. 1457.)

## C. *Is the February 1 Order a QDRO?*

We turn now to the particular issue raised here: Is the February 1 order a QDRO? To establish an order is a QDRO, the parties must show it is a "domestic relations order" and that it is a "qualified" order. (See § 1056(d)(3)(A).)

It is undisputed the February 1 order is a domestic relations order. Section 1056(d)(3)(B)(ii) defines a "domestic relations order" to mean a property settlement agreement which "relates to the provision of . . . marital property rights to a spouse, former spouse, child, or other dependent of a participant" and which "is made pursuant to a State domestic relations law (including a community property law)." (§ 1056(d)(3)(B)(ii)(I), (II).) The February 1 order satisfies these requirements since it reflects a property division upon divorce and was made under Family Code section 2610.

A domestic relations order is "qualified" if it "creates or recognizes the existence of an *alternate payee's* right to, or assigns to an *alternate payee* the right to, receive all or a portion of the benefits payable with respect to a participant under a plan . . . ." (§ 1056(d)(3)(B)(i)(I), italics added.) The order must "clearly specif[y]" the name and address of the participant and of the alternate payee and the amount and manner of the payments to be paid to the alternate payee. (§ 1056(d)(3)(C).) A "qualified" order cannot require the plan to pay increased benefits or provide benefits not otherwise provided under the plan. (§ 1056(d)(3)(D).) The QDRO provisions define "*alternate payee*" to mean "any spouse, *former spouse,* child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." (§ 1056(d)(3)(K), italics added.)

CPT argues the order is not "qualified" because Janet's "successor in interest" is not an "alternate payee" within the meaning of ERISA and because the order provides a type of benefit not offered under the plan. Because we agree with the first (alternate payee) argument, we do not reach the second (type of benefit) argument.

The portion of the February 1 order providing Janet with pension benefits during her lifetime satisfies the "alternate payee" requirement because she is a "former spouse" within the meaning of the alternate payee definition. However, the portion of the order providing Janet's "successor in interest" with the right to potential benefits does not satisfy the "alternate payee" definition since Janet is free to name an individual who is not the "spouse, former spouse, child, or other dependent of a participant . . . ." (§ 1056(d)(3)(K).)

Family Law Specialists maintain the designation of a successor in interest does not invalidate the order because section 1056(d)(3)(B)(i)(I) does not state a domestic relations order is qualified only if *each* potential recipient of benefits is an alternate payee. Rather, the code section states that an order is qualified if it creates or recognizes the rights of an alternate payee to receive pension benefits. (§ 1056(d)(3)(B)(i)(I).) Under the Family Law Specialists' view, the February 1 order satisfies this requirement because Janet is an "alternate payee" and the February 1 order expressly "recognizes" Janet's right to her community property portion of Gene's pension benefits; the fact that the order further permits the alternate payee to exercise her rights under state community property law does not change this conclusion.

While this position may be supported by a literal reading of the QDRO provisions, *Boggs* makes clear that ERISA—when viewed in its entirety—does not permit a third party to obtain a right to pension benefits unless that person falls within ERISA's statutory definitions of a "beneficiary" or "alternate payee." As *Boggs* explains, this result is compelled by the central purpose of the ERISA and REA provisions which seek to provide for the economic security of the participant or the participant's dependents—those defined as "alternate payees." Since Janet's "successor in interest" could be any third party—including a friend, neighbor, or creditor—the order is inconsistent with this fundamental Congressional intent. (See *Ablamis, supra*, 937 F.2d at pp. 1456-1457 [". . . one of Congress' primary purposes in enacting the limited exception to ERISA's prohibition on assignment and alienation was to safeguard the security of the employee's *immediate family members* in the case of divorce or separation," italics added].) Under the existing order, a third party "successor" would have the right to obtain benefits at the expense of the living employee; this outcome is "incompatible with [ERISA's] spendthrift provision." (*Boggs* v. *Boggs, supra,* 520 U.S. at p. 852 [117 S.Ct. at p. 1766].)

Equally important, the rule that only an "alternate payee" may obtain ERISA benefits through a domestic relations order is mandated by the limited scope of a plan's fiduciary obligations, which expressly run only to

"participants" and "beneficiaries." (§ 1104(a)(1).) *Boggs* specifically rejected the argument that a court has the power to recognize an additional class of persons entitled to receive pension benefits: *"It is unpersuasive to suggest that third parties could assert their claims [to ERISA benefits] without being counted as 'beneficiaries.'* A plan fiduciary's responsibilities run only to participants and beneficiaries. (§ 1104(a)(1).) Assets of a plan are held for the exclusive purposes of providing benefits to participants and beneficiaries and defraying reasonable expenses of administration. (§ 1103(c)(1).) Reading ERISA to permit nonbeneficiary interests, even if not enforced against the plan, would result in troubling anomalies. Either pension plans would be run for the benefit of only a subset of those who have a stake in the plan or state law would have to move in to fill the apparent gaps between plan administration responsibilities and ownership rights, resulting in a complex set of requirements varying from State to State. *Neither result accords with the statutory scheme."* (*Boggs* v. *Boggs, supra,* 520 U.S. at pp. 850-851 [117 S.Ct. at p. 1765], italics added.)

Janet's undesignated "successor in interest" is neither a participant nor a beneficiary. A participant is the employee or the former employee. (§ 1002(7).) A beneficiary is defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." (§ 1002(8).) The QDRO provisions specifically add an "alternate payee" to this definition, providing "[a] person who is an alternate payee under a [QDRO] shall be considered for purposes of any provision of this chapter a beneficiary under the plan." (§ 1056(d)(3)(J).) The obvious corollary to this rule is that a third party named in a domestic relations order who is not an alternate payee is not a "beneficiary."

Read together, ERISA's statutory definitions and fiduciary provisions prohibit a court from issuing a domestic relations order requiring an ERISA plan administrator to pay benefits to a person who does not fall within the definition of an "alternate payee." (§ 1056(d)(3)(K).) Because paragraph 5 of the February 1 order may require CPT to pay benefits to an individual (Janet's successor) who is not an alternate payee within the meaning of ERISA, this paragraph is fatal to establishing the order as a QDRO.[9]

We stress the narrowness of our decision. Our holding concerns only the order before us today. We do not decide, as CPT urges us to do, that any

---

[9]We recognize our conclusion in this case is not the approach advocated by the DOL—the agency charged with interpreting the QDRO provisions. However, since DOL failed to discuss the "alternate payee" requirement in their amicus curiae briefs, we are unpersuaded by its contention that the February 1 order may be a QDRO even though Janet is permitted to name a successor in interest. We decline to consider DOL's additional argument (concerning purported inconsistencies in the wording of the February 1 order) raised for the first time in its supplemental amicus curiae brief. Under the circumstances of this case, there are no reasons to depart from the well-established rule an argument raised solely by an amicus curiae

testamentary devise contained in a QDRO is invalid. For example, we do not reach the issue of whether the February 1 order would be valid under ERISA if the parties had specifically identified Janet's "successor in interest" to be a particular individual who came within the "alternate payee" definition (e.g., the Shelsteads' child). We likewise do not determine the validity of a domestic relations order providing a nonemployee spouse with testamentary rights in a form different than that contained in the February 1 order. There are several different ways of dividing a pension benefit, including a "shared payment" approach (dividing the *payments* made to a retired employee) and a "separate interest" approach (dividing the retirement *benefit* rather than just the payments). (See U.S. Dept. of Labor, Pension and Welf. Admin., QDROs: The Division of Pensions Through Qualified Domestic Relations Orders (1997) ch. 3 [available at http://www.dol.gov/dol/pwba/public/pubs/qdro.htm (visited June 9, 1998)].) As noted by the DOL, under the separate interest approach, a court may have additional options permitting it to provide the divorced nonemployee spouse with a form of testamentary rights consistent with CPT's plan and with ERISA. These and other related questions are properly left to a dispute where both spouses are still living, and thus able to advocate their respective positions.

Guided by the recent *Boggs* decision and ERISA's statutory language, legislative history, and underlying public policy, we determine the February 1 order is not a QDRO because it may require CPT to pay benefits to an individual who is not an "alternate payee" within the meaning of the act.

## II. *Jurisdiction*

In its original amicus curiae brief, DOL challenged this court's jurisdiction to determine whether the February 1 order is a QDRO, arguing federal courts have exclusive jurisdiction. In its supplemental brief, DOL states it is not abandoning this argument. The contention is without merit. **(3)** As our Supreme Court recently held, California courts have subject matter jurisdiction to decide whether a superior court's order assigning retirement benefits in a dissolution action is a QDRO. (*In re Marriage of Oddino, supra,* 16 Cal.4th at pp. 73-82.)

## III. *Attorney Fees*

The court awarded Janet $2,000 in attorney fees. The fee order must be reversed since Janet is no longer the prevailing party. ■ Moreover, a party is entitled to attorney fees only if the fees are permitted by statute

is not properly before the court. (See *In re Marriage of Oddino, supra,* 16 Cal.4th at p. 82, fn. 7.)

or agreement. (See *Trope* v. *Katz* (1995) 11 Cal.4th 274, 278-279 [45 Cal.Rptr.2d 241, 902 P.2d 259].) There is no showing in the record that CPT and Janet agreed to a fee award or that the court based its fee award on a specific statute.[10]

## DISPOSITION

We reverse. All parties to bear their own costs.

Nares, Acting P. J., and McDonald, J., concurred.

---

[10]Based on this conclusion, we do not reach CPT's argument that ERISA does not permit attorney fees in an action challenging a plan administrator's decision that a domestic relations order is not a QDRO. (See *AT&T Management Pension Plan* v. *Tucker* (C.D.Cal. 1995) 902 F.Supp. 1168, 1178.)